STATE v. RAPHAEL BEHRMAN.

*Indictment for Fornication and Adultery—Marriage Evidence— Proof of Foreign Laws—Certificate of Foreign Marriage— Res Gestæ.*

1. Any person who claims to know the provisions of the common or unwritten laws of a foreign country may, under section 1338 of *The Code*, testify to and explain them before Courts and juries (SHEPHERD, C. J., dissenting).

2. A paper-writing purporting to be a contract of marriage, and to be signed by the contracting parties at the time of the alleged marriage, is admissible, in the trial of an indictment for fornication and adultery, not only in corroboration of a witness who testified to the facts, but also as substantive evidence to prove the marriage.

3. Where, in the trial of an indictment for fornication and adultery, a photograph of defendant was introduced, on the back of which, signed with his name, were words purporting to be a marriage to his wife and indicating that the one to whom the message was addressed was married, and the alleged wife (prosecuting witness) testified that the writing was the defendant's and that the photograph had been sent to her: *Held*, that such writing was admissible as an acknowledgment of marriage.

4. Where, in the trial of an indictment for fornication and adultery, the material issue was whether the prosecuting witness and defendant were married in a foreign country, a certificate by the officiating rabbi, attesting the marriage and certified by the signature and seal of the official minister of such foreign country, although inadmissible as a record or an independent declaration of the rabbi, it was competent as a part of the *res gestæ* to support the testimony of the prosecuting witness as to the fact of the marriage.

INDICTMENT for fornication and adultery, tried before *Bynum, J.*, and a jury, at Fall Term, 1893, of EDGECOMBE Superior Court.

Sarah Behrman, a witness for the State, testified: "I came from Riga, Russia; know the defendant, Raphael Behrman; was married to him, in Riga, on the 25th of December, 1884, by a rabbi." The witness produced the following paper (translation of marriage certificate):

"The rabbi of the city of Riga herewith attests to the marriage of Raphael Behrman, from Oknian, with Sarah Dinah, daughter of Noah Strauch, from Tuckkum, on December 25, 1884, held in the city of Riga. This is certified by the signature and seal of the official minister.

"(Signed)        M. SHAPIRA, [L. S.]"

And she testified it was given her by the Court, and was signed by the rabbi who married her to the defendant, and that he put his stamp upon it, and she carried it back to the Court and it was stamped by the Court. The following paper was also produced (translation of the marriage contract):

"On the third day of the tenth month, according to the Hebrew calendar, in the year 5640, at that time the son, Raphael, of the father by the name of Aaron, Raphael, son of Aaron, said to Sarah Dinah, the daughter from Noah, that she will be his wife according to the laws of Moses. He says he will support her and take care of her from that day until they are separated by death. It is mutually agreed by them to be man and wife, and he will clothe her and take care of her as becomes necessary from husband to wife. He further agreed that she shall share with him all his wealth, and, if any one should come and

try to take any of it from him, she shall have the preference of it.    This agreement holds from this day as long as they shall live.        (Signed)     RAPHAEL BEHRMAN,
                                        "DINAH BEHRMAN."

And the witness stated this was also signed by the rabbi and given to her at the time of the marriage.    The defendant objected to this evidence.   The objection was overruled, and defendant excepted.    At this stage of the trial one Zander and one Album were sworn by the Court as interpreters, and testified that the "marriage certificate" was written in German, and the "marriage contract" in the Chaldean language, and the two were translated into English, as set out above.    The State then introduced both of these papers.    There was no objection to the translation, but the introduction of the documents was objected to, and the Court overruled the objection, stating to counsel (and so instructing the jury) that they were not admitted as a record of the marriage, but only to corroborate the witness as to her marriage with defendant.    The defendant excepted. A picture was then shown to witness, and the translation of the indorsement thereon, which was in German, was as follows:

"To remembrance from your dear husband, Raphael Behrman, who resides in the city of Norfolk, Virginia, at No. 48 Bank street.    (Signed)     RAPHAEL BEHRMAN."

" Give the inclosed picture to our dear child, so that he will know his unbeknown father.
                "(Signed)     RAPHAEL BEHRMAN."

And she testified, under objection of defendant, that: "This is the picture of my husband.    He sent it to me

from Norfolk, Va., to London,"—and the writing on the back was her husband's.

The picture was then introduced and admitted as evidence only to corroborate the witness as to the marriage. Defendant excepted. She stated she came from London to Norfolk because her husband sent her a "paid ticket."

Album, a witness for the State, stated (under objection) that he was familiar with the law of marriage among the Jews in Russia, and that in Riga it is left with the rabbi who gives the certificate, which is then carried to court and the Russian stamp is put upon it. He also testified that he asked defendant, while in jail, if he had married Sarah Strauch, and he said he had, and then he asked if he had married the other woman, and he said, "Yes, in Washington, D. C."

Sarah Behrman was recalled, and stated that she was familiar with the law of marriage in Russia, and that she was married according to that law.

The defendant testified, in his own behalf, that he was reared by wealthy parents in Russia, and was in the habit of going to Riga when he was sixteen or seventeen years old, and met the witness, who claimed to be his wife, in a house of ill-fame, from which he bought her for $150, and that he maintained illicit relations with her for some time, then left her and went to Hamburg, because he had reason to believe she had robbed him. She followed him there, and he had her sent back to Russia, and he then went to London, thence to Canada, and to Norfolk, and had married his wife (Fannie Kemp) in Washington City. He had never married the other woman. Knows the marriage law of Russia, and both parties have to sign the license before marriage, and he never signed any license. The picture introduced was his photograph, taken in Norfolk, but the writing on the back was not his, and he does not know

how the woman got it.   She was offered $300 to stop this
case.   She had him arrested once before, in Atlanta, Ga.,
and then did not appear, and he was discharged.   He sent
her no money to bring her from London; had never seen
either of the documents set out above.   Left Norfolk after
his marriage with Fannie Kemp and moved to Atlanta,
then to Philadelphia, Suffolk, Va., and then to Rocky
Mount and Whitaker's, N. C.

The State entered a *nol. pros.* as to Fannie Kemp and
introduced her as a witness.   She testified that she and
defendant were married in Washington City about six years
ago and she had been living with him as his wife ever
since.

The jury rendered a verdict of guilty, and from the
judgment thereon defendant appealed, assigning error in
the admission of the testimony objected to.

*The Attorney General,* for the State.   .
No counsel *contra.*

AVERY, J.: The statute provides that "the unwritten or
common law of another State, or of a Territory, or of a
foreign country may be proved as a fact by oral evidence."
*The Code,* §1338.   The plain intendment of the law is that
any person who is competent to testify as to other facts of
which such person professes to have knowledge shall be
permitted to state the pertinent provisions of the unwritten
laws of a foreign country, after having stated that he has
had opportunity to learn what they are.   The Legislature
intended, evidently, that all persons who might profess to
have an acquaintance with such laws should be permitted
to testify what were their requirements as to the celebration
of marriages or entering into any other contracts.   It is
only where by reason of peculiar skill and experience cer-

tain persons are enabled to draw inferences from facts, which
the ordinary untrained mind cannot deduce, that the ser-
vices of experts become desirable if not essential for the
enlightenment of courts and juries. Rogers on Expert
Testimony, p. 18, section 10. When the question is one
addressed to the common sense and involves only the com-
mon experience and sound judgment of mankind for its
solution, the opinions of experts are not admissible. Rogers,
*supra*, p. 14. Whatever conflicts may have arisen between
the Courts of the various States in determining whether a
witness should show some special training or opportunity
to become instructed in such laws (Rogers, *supra*, section
97) we are relieved from doubt and difficulty by the plain
expression by the Legislature of the purpose to allow all
who claim to know the provisions of foreign laws the privi-
lege of explaining them to courts and juries. It was
intended that juries should judge of the skill and intelli-
gence of witnesses testifying upon this subject as they do
when non-expert witnesses are allowed to give their opin-
ions as to questions of sanity. Our statute, however, is
but affirmative of the principle which has been laid down
as the law at an early day by some of the Courts of this
country. Rogers, *supra*, section 96; *Ins. Co.* v. *Rosenagle*,
77 Penn., 514; *Pickard* v. *Bailey*, 6 Foster, 171.

We find no difficulty in arriving at the conclusion that
the prosecuting witness was competent to prove that she
was married according to the laws of Russia, with which
she said she was acquainted. It is equally clear that the
writing, which she testified was signed by the defendant
and herself at the time of her marriage with him, is admis-
sible, not simply as corroborative but as substantive testi-
mony, since, if genuine, it is a declaration of the defendant
tending to establish the fact that the marriage was then
celebrated. 1 Russell on Crimes, 216; *Hill* v. *Hill's Admr.*,

82 Pa. St. Reports, 513. This paper is like the English register of marriage, not a clergyman's certificate, but a paper signed by the parties. "Proof of the register there" (says CAMPBELL, J., in *People* v. *Lambert*, 5 Mich., 349—72 Am. Dec., 1) "is proof of the act of the party as much as proof of his signature to a deed would be."

After the witness testified that the words on the back of a picture of the defendant were in his handwriting and that the writing was sent to her together with the picture, the writing was competent as an acknowledgment by him of the relation subsisting between them, just as was the written statement signed by him at the time of the marriage. 21 Am. and Eng. Enc., 121.

A much graver question was raised, however, by admitting, in the face of objection, the attestation of the celebration of the marriage by the rabbi of the city of Riga, which was certified by the signature and seal of the official minister. We cannot satisfactorily dispose of this case without determining what documentary testimony can be admitted on the trial of criminal prosecutions without invading the constitutional right of a defendant to confront his accusers.

The right to cross-examine one's accusers was never held to exclude the dying declarations of one who by the act of the accused was no longer able to confront him on the trial, provided the declaration was made in the certain expectation of death. *State* v. *Mills*, 91 N. C., 581; *State* v. *Tilghman*, 11 Ired., 513; *State* v. *Williams*, 67 N. C., 12; *State* v. *Shelton*, 2 Jones, 360; *Green* v. *State*, 41 Am. Rep., 744. Where a witness, who was examined on a preliminary hearing or on a former trial of the same indictment, has since died or become insane, or is too ill to be present, or has been induced by the prosecutor or defendant to remove from the State, his testimony may be proved on a subsequent trial, when it appears that the accused was

present and had the opportunity to cross-examine the witness when such testimony was delivered. *State* v. *King*, 86 N. C., 603; *State* v. *Grady*, 83 N. C., 643; *State* v. *Valentine*, 7 Ired., 225; *State* v. *Taylor*, Phil., 508. Where facts from their very nature can only be proved by a record or a duly authenticated copy of a record, proof of them does not fall within the constitutional inhibition since the genuineness of the original was determined by inspection and of the copies by an examination of the certificates, and the right to confront accusers was intended to be secured to the accused, not under all circumstances, but only where it would bring with it the benefit of testing the truth of testimony by meeting a prosecuting witness face to face and subjecting him to cross-examination. 3 Am. and Eng. Enc., 735, note; *Tucker* v. *People*, 122 Ill., 592; *State* v. *Matlock*, 70 Iowa, 229; *People* v. *Jones*, 24 Mich., 225; *U. S.* v. *Ortega*, 4 Wash., 531; *Hutchins* v. *Kimmel*, 31 Mich., 130.

Before the passage of the Act of 1823 (*The Code*, §1338) a printed copy of the acts of the Legislature of another State was not admissible in our Courts to prove its statute law, but a properly authenticated copy was competent both in civil and criminal actions. *State* v. *Twitty*, 2 Hawk., 441; *State* v. *Patterson*, 2 Ired., 346. Upon the principle that we have stated it has been held by this Court that a deed duly proved and registered is competent evidence to show the transfer of land, whenever it may become material to do so either in the trial of civil or criminal actions. *State* v. *Shepherd*, 8 Ired., 195.

It is conceded that if the paper offered had been a properly authenticated copy of a record of marriage required to be kept in a sister State, it would have been competent in a criminal prosecution. But it is needless to pass upon the question whether authenticated copies of marriage records of foreign countries would be competent evidence

in any criminal case, since the paper admitted purports to be the original certificate of the rabbi, verified by the signature and seal of the official minister, and unless this Court is bound to know the signature and seal of that official, and that he is the custodian of marriage records, the paper must be considered, not as a record, but merely as an original certificate offered in connection with the testimony of the witness that she was married to the defendant at the date mentioned in the paper—the appended writing being but the extra official statement of a private person. 1 Greenleaf Ev., sections 493 and 498. At an early period of our national history it was held that the record of a foreign Court could not be authenticated by the signature of even an American Consul resident in such country (*Church* v. *Hubburt*, 2 Cr., 165 [187]), and subsequently a statute was passed which empowered and made it the duty of a Consul of this Government to keep a record of marriages celebrated in his presence and send copies to a specified office in this country. Rev. Stat. of U. S., sec. 4082. If the paper offered is not competent because not properly authenticated, as an official record, it was not admissible at all as documentary evidence of the marriage, because, as was said in *People* v. *Lambert, supra,* a certificate merely signed by a minister, while perhaps it may avail in civil proceedings if properly supported, cannot avail in criminal cases where the defendant is entitled to confront his witnesses. *Gaines* v. *Relf,* 12 How., 472.

The defendant was accused of an infamous crime, and in such cases it was said by PEARSON, C. J., in *State* v. *Thomas,* 64 N. C., 76, that the word " confront " was intended not simply to secure to the defendant " the privilege of examining witnesses in his behalf," but was " in affirmance of the rule of common law that in trials by jury the witness must be present before the jury and accused, so that he

may be confronted—that is, put face to face." In that case
the State offered certain entries made by a station agent in
the books of a railroad company, when said agent was in
the State of Virginia, to show that the cotton, in reference
to which it was charged that a perjury had been committed,
had been received by the defendant. The books were kept
by the company as evidence of the conduct of its business
and were identified, but the statements recorded in them
were, when offered on behalf of the prosecution, but the
written declarations of the agent. His testimony was the
highest evidence of the transaction, but could be heard
without the consent of the accused only when delivered
*viva voce* in his presence.

But, while the paper was not admissible as a record or an
independent declaration of the rabbi, we think it was made
pertinent and competent evidence, even in a criminal prose-
cution, by the testimony of the witness that it was given
to her at the very time of the marriage. While the certifi-
cate thus given may tend, when admitted, to support the
testimony of the witness to the fact of marriage, it is com-
petent only as a part of the *res gestæ*, being a declaration
made in the presence of the defendant and accompanying
the act of solemnizing the rite, if it did not constitute a
part of the ceremony. 1 Bish. on Mar. and Div., sec. 1006.
It is true that the criminal act charged was the second mar-
riage, but evidence of words or acts accompanying and
reflecting light on any transaction which becomes material
in the progress of a trial is admissible as *res gestæ*. 1 Ros-
coe, star p. 26; Best on Ev., 663. It would have been
competent for the witness to repeat all that was said
by the rabbi in celebrating the rite. It was equally admis-
sible to show his declaration, oral or written, in the pres-
ence of both, that they were lawfully married, as an imme-
diate result of what was done. 21 Am. and Eng. Enc., 99
and 102, note 1.

The paper was admitted on the trial as corroborative, not as substantive evidence. There is no principle upon which such testimony amenable to the constitutional objection which we have discussed, if offered as substantive evidence, can be permitted to go to the jury in corroboration of a direct witness to the main point to which it relates. A declaration excluded by the Constitution, as in violation of individual right, will not be allowed to accomplish indirectly what it is not permitted to do directly—lead a jury to believe that a marriage was celebrated when the guilt of the accused hinges upon the question of its solemnization.

We have been led into this discussion because it is important to understand clearly how this declaration is admissible under the peculiar circumstances, while it would ordinarily be excluded on the trial of criminal prosecutions as hearsay, or for the reason that it falls within the constitutional inhibition imposed for the protection of persons accused of crime.

The defendant has no just ground for complaint if the jury were allowed to consider a paper which was admissible as a part of the transaction only for the purpose of corroborating the witness as to the fact of the marriage.

Judgment Affirmed.


CLARK, J., concurring: There was objection to Album testifying, but no exception was taken nor is any ground assigned for the objection. If the objection was that he was not sufficiently qualified as an expert, the finding of the Judge below is conclusive. *State* v. *Davis*, 63 N. C., 578; *Smith* v. *Kron*, 96 N. C., 392; *State* v. *Hinson*, 103 N. C., 374; *State* v. *Brady*, 107 N. C., 822. He is presumed to have so found if the witness was admitted as an expert. If the objection was that the witness was not an expert, that ground is not assigned and the Court is not to presume

that there was error. In truth, however, *The Code*, §1338, providing that the common law of another State or country may be proved as *a fact* by oral evidence, would seem to indicate that expert evidence would not be requisite. If so, when the witness testified that he knew the law as to marriage among the Jews in Russia he was competent to testify what it was, leaving his credibility to be tested by a cross-examination as to his means of information, whether he had lived in Russia, etc. It does not appear that he had not lived there, and his testimony would indicate that he had. But if he had not, it would have remained for the jury to say what credit should be given to his evidence. He may have acquired such knowledge by reading or otherwise, just as the same witness was admitted as a competent interpreter of German and Chaldaic without showing that he had lived either in Germany or Chaldea.

SHEPHERD, C. J., dissenting: I cannot assent to the broad proposition that any person who simply professes to have knowledge of the unwritten laws of a foreign country, and who merely states that he has had an opportunity of learning them, is a competent witness in respect to their requirements as to the celebration of marriages or the entering into other contracts. Our statute, providing that such laws "may be proved as a fact by oral evidence" is but in affirmance of a general principle laid down in the works on evidence (1 Greenleaf Ev., 486; 1 Wharton Ev., 303), and very clearly does not change in the slightest degree the existing rules as to the competency of witnesses by which such laws are to be established. This is plainly manifest by the declaration of this Court in *Moore* v. *Gwyn*, 5 Ired., 187 (a case decided long after the statute was enacted), that "the existence of such a law could be proved only by the opinions of persons learned in that law." It

would, it seems to me, be a novel thing in our jurisprudence to allow a plaintiff suing in the Courts of North Carolina upon a contract made in another State or country to testify not only to the terms of the contract, but also to *lex loci contractus*, upon his bare statement that he is familiar with such law. In the decisions of this Court it will be seen that only professional witnesses have been examined, but the rule in this respect has been relaxed to some extent in other jurisdictions and it has been laid down, as stated in *Insurance Co.* v. *Rosenagle*, 77 Pa., 514 (cited in the opinion of the Court), that "the law of a foreign country on a given subject may be proved by any person who, though not a lawyer or not having filled a public office, is or has been in a position to render it probable that he would make himself acquainted with it." This view seems to have been adopted by many of the Courts, but it is surely no authority in support of the rule as stated in the opinion in this case. In the case above mentioned there was much more than the statement of the witness that he was familiar with the laws of a foreign country. He was a resident of that country, and he testified that he was the Catholic dean and parson at Odenheim, and that as such he was the proper custodian of the records of births, baptisms, marriages and deaths of the parish. He was permitted to testify that the records had been kept according to the laws of the country. The Court said: "It was his duty to know, and he testified that he did know, the law relating to the records in his charge. His knowledge was just that which the responsible head of a public office would be assumed to have of the law which had controlled the past operations of his department." Equally inapplicable, I think, is the point of decision in *Pickard* v. *Bailey*, 6 Foster, 171, the other case cited in the opinion. In that case the witness had acted as a magistrate in Canada and had also

been extensively engaged in mercantile business there, and in such employment had become acquainted with the law in relation to notarial instruments.    He was held competent to testify that it was the sworn duty of every notary not to suffer any original paper executed before him to be taken out of his custody, and that notarial instruments are received in all the Courts in Canada without further proof of the execution of the original.    These cases are similar in principle to those cited in Rogers on Expert Testimony. That author states that "in order to prove the law of a foreign country it is necessary that the witnesses produced to testify in respect to it should be *more* than ordinarily capable of speaking upon the subject" (sec. 96), and the cases cited by him also establish the proposition that the knowledge must be acquired in the foreign country,    Sec. 100; see also, 1 Bishop Marriage and Divorce, 1123.

Applying these principles to the present case, I am very certain that the testimony of the witness Album should not have been received.    All that the witness stated as to his competency was "that he was familiar with the law of marriages among the Jews in Russia."    He does not state how he acquired such knowledge nor does it appear that he was ever in Russia in his life.    For aught that appears in the record he may have been born and raised in the county of Edgecombe, and it is not pretended that he witnessed the marriage.    His testimony, therefore, is opinion evidence only, and I am unable to see why any other resident of said county is not as competent to testify to the law of Russia, provided he simply states that he is familiar with its laws.

Had this witness testified to the *fact* of the marriage and that it was solemnized in the manner usual and customary in Russia by a person duly authorized to celebrate the rites of matrimony, and the parties afterwards lived together as

man and wife, his testimony would have been competent, and it would have been unnecessary to offer any further evidence of the law in order to establish the marriage.   1 Bishop, *supra*, 1122.   "And there is almost authority," remarks Mr. Bishop, *supra*, 1124, "for saying that any *inhabitant* of a foreign country may be a witness to its marriage laws, because, as judicially observed ( *Wottrich* v. *Freeman*, 71 N. Y., 601), all residents of a country of marriageable age and ordinary understanding are familiar with the usual and customary forms of marriage." The contrary was held in England, but the rule would seem to be in the line of public convenience and policy.   However this may be it is not applicable to this case, as we have seen that notwithstanding the defendant's objection the witness was not qualified in any way to testify as to the laws of Russia nor was it shown that he was a Russian or that he was ever in that country.

Without discussing the subject further I conclude that under the most liberal rules to be found in the text-books or decided cases the witness Album was incompetent and that his testimony should have been excluded.   I am also of the opinion that the general proposition that not only the law of marriage but all other unwritten laws can be proved in such a loose and unsatisfactory manner is dangerous in its consequences and contrary to our own decisions as well as the consensus of judicial authority.

It is proper to say that the witness "testified under objection" and defendant moved for a new trial upon the ground of error in admitting improper testimony. The Attorney General made no point as to the formality of the exception, and the admissibility of the testimony was fully argued by him.