## STATE v. JOHN J. JEFFERSON.

(Decided December 22, 1899.)

*Indictment, Murder—Evidence—Dying Declarations—Degrees of Murder, Act of 1893, Chap. 85.*

1. Evidence of dying declarations of the deceased is restricted by the law to the act of killing, and those facts and circumstances directly attending the act, and forming a part of the *res gestae.* *State v. Shelton,* 47 N. C., 360.

2. When it was too dark for the deceased to have recognized the prisoner as the person who shot him from a clump of bushes, a mere opinion of the deceased, founded on what had occurred between him and the prisoner that morning, that the prisoner was the man who fired the fatal shot, is not admissible as a dying declaration. *State v. Williams,* 67 N. C., 12.

3. Where the indictment is in the usual form embracing the different degrees of murder, the jury in their verdict shall determine whether the crime is murder in the first or second degree. Act of 1893, chap. 85, sec. 3.

INDICTMENT for the murder of Calvin Barnes, tried before *Battle, J.,* at October Term, 1899, of the Eastern District Criminal Court of WILSON County.

The indictment was in the usual form, embracing both degrees of murder. The prisoner was found guilty of the felony and murder whereof he stands indicted, in manner and form as charged in the bill of indictment. The verdict not specifying the degree of murder.

Upon the trial, James D. Barnes, son of the deceased, witness for the State, was allowed to testify as to declarations made by the deceased the night he died. The prisoner objected to the evidence, but it was admitted as the dying declaration of deceased—the Court finding the facts to be that deceased was in view of death, and believed he could not live.

James D. Barnes testified: "I am son of deceased. He came home at 7.20 p. m. Ned Branch was with him; he and I took him from the buggy and carried him to back porch. I asked father if he was shot much? He answered, 'I am shot through the breast, and can not live.' We put him on the back porch; then took cot and all in bed-room, and I went after Dr. Herring. He came, and father said: 'Ned, the ball is right here' (pointing to his breast). Dr. Herring got ball out, and after he cut it out, he sent for me, and told me to have John Jefferson arrested; that they had words about tobacco hands and corn, and he had gone off about noon after hands and hadn't come back after sunset, when he left. When he got half way down Hominy Hill, somebody shot him; he looked back and saw a man running out of a clump of bushes at hog pen, but could not recognize him; too dark to recognize him. This was 8.30 or 9 p. m. He died 2.29 a. m., same night. Then warrant was issued."

Defendant excepted.

There was a verdict of guilty. Judgment of death, from which the defendant appealed to the Superior Court of Wilson County.

The appeal came on to be heard before *Hoke, J.,* at November Term, 1899, of the Superior Court of said county, and his Honor sustained the exception of the defendant, and adjudged that there be a new trial had, for this cause, before another jury.

The Solicitor for the State excepts, and takes an appeal to the Supreme Court. Notice waived.

*Attorney-General,* for the State.
*Mr. John E. Woodard,* for the prisoner.

MONTGOMERY, J. The prisoner was convicted of murder at the Otcober Term, 1899, of the Eastern District Criminal

Court, held for the county of Wilson, and sentence of death was passed upon him. The prisoner appealed.

At the November Term of Wilson Superior Court, the appeal was heard, and his Honor, Judge Hoke presiding, held that there was error in the trial in the Criminal Court in admitting certain portions of the evidence offered as the "dying declarations" of the deceased, and the prisoner was given a new trial. The Solicitor for the State excepted, and appealed to this Court.

Calvin Barnes was shot and mortally wounded on the public highway near his home in Wilson County, about 7 o'clock on the evening of the 29th of August, 1899. His murderer was in ambush. The prisoner was tried for this crime, and convicted and sentenced as above set forth. On the trial in the Criminal Court, James D. Barnes was introduced to prove the dying declarations of his deceased father. No exception was made by the prisoner's counsel to the ruling of his Honor that the dying declarations of the deceased should be admitted, but the prisoner did except to the matters and things which the witness was allowed to testify to, because, as he alleged, those matters and things were not dying declarations of the deceased; that the matters testified to by the witness were not only hearsay evidence, but were also merely opinions of the deceased as to the identity of the prisoner with the person who shot him. The testimony of the witness in reference to the dying declarations, was as follows: "He (Dr. Herring) got the ball out, and after he got it out, he (the deceased) sent for me, and told me to have John Jefferson arrested; that they had had words about tobacco hands and corn, and he had gone off about noon after hands, and had not come back after sunset when he left. When he got half way down Hominy Hill, somebody shot him; he looked back and saw a man running out of a clump of bushes at a hog-pen, but

could not recognize him—too dark to recognize him." We think that the ruling of Judge Hoke that there was error in the admission of that testimony as a dying declaration of the deceased, and that the prisoner was entitled to a new trial on that account, was correct.

At most, the evidence was but the *opinion* of the deceased that the prisoner shot him, that opinion being founded on what had occurred between the deceased and the prisoner during the morning of the day on which he was mortally wounded, for the deceased did not see the person who shot him, because of the darkness of the hour. The opinion of the deceased as to the identity of the person who shot him with the prisoner, was not the direct result of observation through his senses or any of them. It was an opinion formed through the process of reasoning, based upon antecedent transactions, and the conduct of the prisoner during the morning of the day on which the deceased was shot. Such evidence was not admissible as dying declarations. *State v. Williams,* 67 N. C., 12.

Again, dying declarations must be confined to the facts connected with the act of the killing, facts attending the act and forming a part of the *res gestae*. *State v. Shelton,* 47 N. C., 360.

The general rule is, that testimony, before it is received in evidence, shall be on the oath of the witness, and subject to the right of cross-examination. The nearness and certainty of death are just as strong an incentive to the telling of the truth as the solemnity of an oath, but you can not subject the deceased and what he said as a dying declaration to the test of cross-examination. The exception to the general rule of evidence therefore, in regard to dying declarations, rests upon the grounds of public policy and the necessity of the thing. And as the exception can only be sustained on the grounds

above mentioned, such evidence is restricted by the law to the act of killing and those facts and circumstances directly attending the act and forming a part of the *res gestae*. All of this is clearly decided in *State v. Shelton,* 47 N. C., 360. In that case, Chief Justice PEARSON, delivering the opinion, said: "If it (the exception to the general rule of evidence in respect to dying declarations) can be extended to a separate and distinct act occurring half an hour before, it will extend to any act done the day before, or a week, month or year. As soon as the limit fixed by absolute necessity is passed, the principle upon which the exception is based being exceeded, there is no longer any limit whatever, and dying declarations become admissible, not merely to prove the act of killing, but to make any homicide murder by proof of some old grudge. That the exception is restricted in the manner above stated is clear from the reason of the thing, and is settled by authority." We have examined the decided cases in our Reports upon this question, and we find not a single one in conflict with the law laid down in *State v. Shelton, supra.* And it is a matter of some surprise to us that evidence so clearly incompetent as that which we have recited, should have been offered in the case by the prosecuting officer, and that it should have been received by the Court as competent.

It is true that there was a great deal of proof—competent proof—offered and received by the Court, which tended t show that the prisoner fired the shot which killed the deceased. The jury would have been warranted in convicting the prisoner under that evidence, but we do not know that they would have done so. A good deal of it consisted of confessions made by the prisoner, and that class of evidence is usually regarded as not the strongest.

But it is evident that the purpose of the prosecuting officer was to give the State the benefit of the *opinion* of the deceased

that the prisoner fired the gun.    That he succeeded in doing, through the evidence which was excepted to; and that was exactly what he was not allowed to do by the law and the decisions of this Court.    *State v. Williams, supra.*

Upon reading the record in this case, it is probable that the prisoner's life was in danger at the hands of some lawless persons at and about the time of the homicide.    Such a spirit is greatly to be deprecated and deplored, but sitting as we are as a court of last resort, in whose hands are confided all the legal rights of the people of the State, we can not, if it should be expected of us by any class of our citizenship, allow the life of anyone to be taken under the form of law upon evidence, in part, wholly incompetent, and of such serious nature as was the evidence excepted to in this case by the prisoner on the trial.

But, besides what we have said, the prisoner would have been granted a new trial for another cause.    The indictment in the Criminal Court was in the usual form for murder. The verdict of the jury was that the prisoner, John J. Jefferson, "is guilty of the felony and murder whereof he stands indicted in manner and form as charged in the bill of indictment."    Under chap. 85, of the Laws of 1893, in which the crime of murder is divided into two degrees, sec. 3 reads as follows:    "Nothing herein contained shall be construed to require any alteration or modification of the existing form of indictment for murder, but the jury before whom the offender is tried *shall determine in their verdict whether the crime is murder in the first or second degree.*"    In this case, as we have seen, the verdict of the jury was a general one without a response as to which grade of murder the prisoner was guilty. The verdict was that the prisoner was guilty of murder as charged in the bill of indictment, and the bill of indictment was one in form covering murder in either degree.    At this

term of the Court, in the case of *State v. Truesdale,* it was held that such a verdict on such a bill of indictment could not be sustained, and a new trial was ordered.

New trial.