STATE v. SOPHIA E. LAYTON.

(Filed 14 June, 1933.)

**1. Homicide G c—Foundation for admissibility of dying declaration held properly laid in this case.**

Testimony that deceased declared she was going to die, and that at the time of the declaration she was desperately sick and that death ensued within two days, constitutes a proper foundation for the admissibility of her dying declaration, and since a dying declaration is judged by the same standards as other evidence and is not admissible unless the declarant could testify to the same facts if he were a witness, the testimony of declarant's attending physician as to whether declarant thought she was going to die at the time of the declaration is immaterial.

**2. Same—**

The fact that a dying declaration does not identify defendant does not render it incompetent where there is other sufficient evidence of defendant's identity as the perpetrator of the crime, the dying declaration being of a material fact connected with the crime.

**3. Homicide G e—Evidence of defendant's identity as person who committed abortion resulting in death held sufficient.**

In this prosecution for performing an abortion resulting in death there was evidence that defendant had agreed to perform an abortion upon deceased for a stated sum, that defendant visited deceased's room at a hotel and stated that she left an instrument with deceased which deceased could use if she desired, that defendant was seen leaving the elevator in deceased's hotel and that the witness immediately went to deceased's room and that deceased immediatly said that a lady had performed the operation, and that defendant received a sum of money from deceased's associate, *is held* sufficient to be submitted to the jury on the question of defendant's identity as the person who had committed the abortion.

CRIMINAL ACTION, before *Cranmer, J.,* at January Term, 1933, of
WAKE.

The defendant was indicted for the murder of Celia Roberts. The
evidence tended to show that Miss Celia Roberts, a young woman, about
twenty years of age, became pregnant. Harris, a witness for the State,
testified that he came to Raleigh on 11 July, and at the request of a man
named Mangum made an appointment with the defendant "to see if she
would perform an abortion on Miss Celia Roberts." The defendant in-
formed him that the cost would amount to $30.00. Thereafter on the
14th or 15th of July Miss Roberts came to Raleigh and went to the
Carolina Hotel and procured a room. Harris immediately informed
the defendant that Miss Roberts was at the hotel. She went to the hotel
with Mangum and a woman and went to the room of deceased. Harris
thereafter paid to the defendant and she accepted $14.00 in cash.
Mangum testified that the deceased Miss Roberts described the defendant
to him and that on Tuesday he saw her get off the elevator at the hotel
as he was getting on, to visit the deceased in her room. He testified
that when he reached the room of the deceased she said: "it was all
over, the operation. She said a lady did it" but did not know her name.
He had seen the defendant go out. "I did not see Mrs. Layton in the
room, but I saw her on the elevator." The State also offered evidence
that the defendant stated to Harris that she had left an instrument
that Miss Roberts could use, but that she could not perform the opera-
tion for the reason that the deceased was then five months pregnant. Dr.
Thomas examined the deceased in the hospital on 22 July and found
that she was suffering from an incomplete abortion, resulting in death
on 24 July. The physician further testified: "She was desperately sick
when she came there, and we so advised her. When I was taking her
history she told me she knew she was going to die. You know, people
talk sometimes when they are sick. She just said: 'I am so sick I am
going to die.' I told her that she was very sick, but was not necessarily
sick enough to die or something like that." At this point in the testi-
mony the court asked the physician the following questions: "Did she
appear to you to be in apprehension of impending death?" (A.) "Her
temperature was very high and her pulse very rapid." (Q.) "When she
made that statement that she thought she was going to die do you think
she thought she was going to die?" (A.) "Yes." (Q.) "Did she make
any statement to you, and, if so, what did she say?" (A.) "I asked
her how long she had been sick?  . . .  (This was on Tuesday), and
she said on last Friday she came to Raleigh and went to the Carolina
Hotel, and some lady came to her room and inserted a tube into her
womb about eleven o'clock, and at three o'clock in the morning she
went to the bath room and the fetus passed. I made a blood test and

she was very sick." The defendant objected to the questions so propounded by the court and to the answers of witness, particularly to the answer containing the purported dying declaration of deceased.

There was evidence that the defendant had refused to perform the operation and that the deceased had stated to the witness Harris that "she had done it herself and the woman would not help her." The defendant denied that she had anything to do with the abortion or that she had ever seen the deceased or talked with Harris about performing the operation. Several witnesses testified that the character of the defendant was good. The jury convicted the defendant and recommended mercy. The trial judge imposed a sentence of five years in the State's prison, and from the judgment so pronounced the defendant appealed.

*Attorney-General Brummitt and Assistant Attorney-General Seawell for the State.*

*Thomas W. Ruffin and R. B. Templeton for defendant.*

BROGDEN, J. (1) Was the dying declaration of deceased competent?

(2) Was there sufficient evidence that the defendant committed the crime laid in the bill of indictment?

The general principle is that "dying declarations must be confined to the facts connected with the act of killing, facts attending the act and forming a part of the *res gestæ.*" *S. v. Jefferson,* 125 N. C., 712, 34 S. E., 648. The competency of dying declarations is determined by the same standard as the testimony of a living witness in the court and subject to cross-examination. That is to say, the fact that a certain declaration is made by a dying person, does not make the declaration competent unless the same person could take the witness stand and testify to the identical fact contained in the declaration. Consequently it has been held with unbroken uniformity that the mere opinion and conclusions of a dying declarant are not admissible. *S. v. Mills,* 91 N. C., 594; *S. v. Jefferson,* 125 N. C., 712; *S. v. Beal,* 199 N. C., 278, 154 S. E., 604; *S. v. Stone, ante,* 666. Hence the opinion of the physician as to whether the deceased "thought she was going to die" is immaterial because the ultimate inquiry was not what the physician thought but what the deceased thought about her impending death. The testimony discloses that the deceased declared that she was going to die. She was then desperately sick and death ensued within two days. Such testimony constituted a proper foundation for the admissibility of her dying declaration. *S. v. Shelton,* 47 N. C., 360; *S. v. Jefferson, supra; S. v. Wallace,* 203 N. C., 284. Therefore, the opinion of the physician as to her state of mind, while immaterial, does not warrant the overthrow of the judgment. Nor is the dying declaration incompetent for the reason

that the deceased did not positively identify the defendant. *S. v. Beal, supra; S. v. Wallace, supra.* If there had been no evidence tending to connect the defendant with the crime except the dying declaration of deceased that "some lady came to her room and inserted a tube into her womb," the case should have been nonsuited, but the evidence discloses other pertinent facts and circumstances pointing to the accused. These may be capitulated from the State's evidence, as follows: (1) The defendant had agreed to perform an abortion upon the deceased for the sum of $30.00. (2) The defendant visited the deceased at the hotel and stated that she had left an instrument with the deceased which she could use if she so desired. (3) The defendant was seen coming down on the elevator and the State's witness went to the room of the deceased immediately and she said "it was all over, the operation. . . . a lady did it." (4) The defendant received $14.00 in money paid by the witness Harris.

The foregoing facts and circumstances are sufficient in probative value to warrant the submission of the disputed issue to the jury. The charge of the court is not in the record and it is therefore assumed that the jury was correctly instructed upon all phases of the case.

No error.