STATE v. C. C. STEWART AND OLLIE PARISH.

(Filed 30 June, 1936.)

**1. Homicide G c—**

Whether testimony is competent as being of a dying declaration is a question of law for the court, and, on appeal, the Supreme Court may determine only whether there was evidence tending to show the facts necessary to support the decision of the trial court.

**2. Same—Evidence held insufficient to support decision that testimony was competent as being of dying declaration.**

The evidence tended to show that deceased had been in the hospital for nine days before making the statements to the State's witness, and it did not appear that during this period deceased was advised by physicians or nurses that her illness would probably be fatal, or that deceased expressed to nurses or friends and relatives visiting her that she apprehended she was going to die. Before making the statements to the State's witness, deceased answered in the affirmative a question asked her by the witness as to whether deceased thought she was going to die. Deceased died thirteen days after making the statements. *Held:* The statements were not competent as dying declarations made by deceased, since the evidence fails to show that, at the time of making the statements, deceased was *in extremis* or in danger of death from her illness, or that she was apprehensive of her approaching death, and the testimony was incompetent as hearsay, and its admission over defendants' objection entitles defendants to a new trial.

STATE v. STEWART.

APPEAL by defendants from *Sink, J.,* at February Term, 1936, of GUILFORD. New trial.

The defendants in this action were tried on an indictment in which they were both charged with the murder of Ethel Smith.

When the action was called for trial, the solicitor for the State announced that on the evidence which he would offer, the State would not contend that the defendants are guilty of murder in the first degree, but would contend that they are each guilty of murder in the second degree, or of manslaughter, as the jury should find the facts to be from all the evidence.

Each of the defendants entered a plea of not guilty.

The evidence for the State tended to show that Ethel Smith, the daughter of W. A. Smith, left the home of her father, in Guilford County, about six miles north of the city of Greensboro, about 6:30 o'clock p.m., on Monday, 5 November, 1934, in an automobile driven by the defendant Ollie Parish. They arrived at the home of her sister, Mrs. Eli R. Brewer, in the city of Greensboro, about 8:30 that evening. At the time she arrived at the home of her sister, Ethel Smith was apparently in her usual condition, both physical and mental. The defendant Ollie Parish, after remaining with her about fifteen minutes, during which time they talked together as usual, left her at her sister's home, where she remained Monday night, all day Tuesday and Tuesday night. During this time she did not leave her sister's home, or have any visitors there. At about 6 o'clock a.m., on Wednesday, 7 November, 1934, she called her sister, Mrs. Brewer, who went to her room, and found her suffering severe pain. Mrs. Brewer immediately called Dr. W. P. Knight, a physician practicing in the city of Greensboro, who arrived at her home about 7 o'clock a.m. Upon examining Ethel Smith, Dr. Knight discovered that she was pregnant, and was having a miscarriage, which he testified was the result of an abortion caused by the use of instruments. Upon the advice of Dr. Knight, Ethel Smith was removed from the home of her sister to St. Leo's Hospital, in the city of Greensboro, where she remained, under the treatment and care of physicians and nurses, until 29 November, 1934, when she died. Her death was the result of an abortion committed on her by the use of instruments prior to 7 November, 1934. At the date of her death, Ethel Smith was about 20 years of age, and was unmarried.

The defendant Ollie Parish is about 35 years of age. His home is about three-tenths of a mile from the home of W. A. Smith, the father of Ethel Smith. He had been "going with her" about two and a half years before her death. During this time he had visited her at her father's home only two or three times. He was, however, with her frequently—almost every week—elsewhere. When he called for her on

Monday evening, 5 November, 1934, he blew the horn on his automobile, and waited for her. After putting on her cloak and hat, she went out and joined him. They left her father's home, driving in the direction of the city of Greensboro. It usually takes about 15 minutes to drive an automobile from the home of W. A. Smith, the father of Ethel Smith, to the home of her sister, Mrs. Brewer, in the city of Greensboro, a distance of about six miles. When the defendant Ollie Parish left Ethel Smith at her sister's home, he told her that he would call there to see her the next day. He did not call on her or see her after he left her sister's home on Monday evening. He was arrested after Ethel Smith was removed from her sister's home to St. Leo's Hospital. After his arrest, and while he was in jail, he said to Mr. Brewer, the brother-in-law of Ethel Smith, who had called at the jail to see him: "I was going to marry her; I intend to marry her."

The defendant C. C. Stewart is a Negro. He is a physician, and has an office in the Stewart Building, on East Market Street in the city of Greensboro.

Mrs. Minnie D. Hinton, a witness for the State, testified as follows:

"I am employed by the county board of public welfare of Guilford County as the case supervisor. On Thursday, 8 November, 1934, I was directed by the superintendent of public welfare to investigate the case of Ethel Smith. Accordingly, on Friday, 9 November, 1934, I went to St. Leo's Hospital in the city of Greensboro, where I found Ethel Smith. She was in bed and was apparently quite sick. After my first visit, I saw her in the hospital about five times before her death. Her condition did not improve.

"On 16 November, 1934, in consequence of information which I had received, I went to the hospital and saw Ethel Smith there. I had two conversations with her, the first about supper time. I do not remember what she said then as to whether she thought she would get well. She said she was quite sick, and was afraid that she would not get well. She appeared very weak and I had to get close to her to hear what she said. I knelt down by her bed. She told me that she was pregnant, and that Ollie Parish was responsible for her condition; that he had taken her to a Negro doctor to get rid of the 'youngun,' as she expressed it. She said she did not want to do it, but that Ollie Parish told her it would do her no harm. She said the Negro doctor was Doctor Stewart, whose office was on East Market Street, beyond the underpass. She said that he put her on a table and used an instrument, and that she went to the doctor three times, the last time being Monday night, 5 November, 1934. He then put her on a table and placed a tube in her. He told her to leave the tube in her until Tuesday night, and that if anyone asked her what had happened to her, to say that she had taken quinine. She said

that she became very sick Tuesday night, and was taken to the hospital the next morning by Doctor Knight. She said that Ollie Parish took her from Dr. Stewart's office on Monday night to the home of her sister, where she became very sick.

"After this conversation I went home. After I had retired, a call came for me to return to the hospital. This was several hours—four or five—after my first conversation with Ethel Smith, at supper time. I went back to the hospital and found that Ethel Smith was still very, very sick. Mrs. Long, a stenographer, her husband, Mr. Long, and Mr. Ballinger accompanied me. Mrs. Long was with me to take down in shorthand any statement Ethel Smith might make. She took down a statement made by Ethel Smith in my presence. I asked the questions and Mrs. Long took down the answers of Ethel Smith. These questions and answers, as transcribed by Mrs. Long, are as follows:

"Q. Ethel, do you think you are going to die?

"A. I do.

"Q. Tell me what caused your condition?

"A. I was pregnant.

"Q. By whom?

"A. Ollie Parish. Ollie said I would have to get rid of the youngun. He said it would be no harm. I did not want to do it. He said I would have to.

"Q. Where did he take you?

"A. To a Negro doctor.

"Q. What Negro doctor?

"A. Dr. Stewart.

"Q. What did he take you to Dr. Stewart for?

"A. To get rid of the kid.

"Q. What did Dr. Stewart do to you?

"A. He put me on the table and used an instrument to open me up.

"Q. What did he open you up for?

"A. To get rid of the child.

"Q. What did Dr. Stewart say to you?

"A. He said not to say anything about it. If anybody asked me what was the matter to tell them I had taken quinine. He said he would open me up that night, and for me to come back on Saturday night, and he would do the rest.

"Q. When was the first time Ollie Parish took you to Dr. Stewart?

"A. He took me about the first of October, at night every time.

"Q. When did Ollie Parish take you again to Dr. Stewart?

"A. About two or three weeks later.

"Q. When was the last time Ollie Parish took you to Dr. Stewart?

"A. Monday night a week ago. Went three times in all.

STATE *v.* STEWART.

"Q. What did he do the last time?

"A. He put me on the table and used some kind of instrument.

"Q. What else did Dr. Stewart do?

"A. The last time he put a tube in me. He told me to take it out the next night at the same time. I did so, and that was when I was taken so sick.

"Q. Where did you go after leaving Dr. Stewart's office?

"A. Ollie took me to my sister's and left me there. He said he would call me the next night.

"Q. Did he ever call?

"A. No.

"Q. Then what happened?

"A. I got sick Tuesday night and had my sister to call the doctor (Knight) about daylight Wednesday morning. He came and told me he would send an ambulance for me. The ambulance came and took me to the hospital."

The defendants in apt time objected to all the testimony of Mrs. Minnie D. Hinton with respect to any statements made to her by Ethel Smith, and with respect to any answers made by Ethel Smith to questions addressed to her by the witness. These objections were overruled by the court, upon its holding that the testimony was competent as tending to show dying declarations of Ethel Smith, the deceased. The defendants duly excepted to the rulings of the court as to the competency of the testimony and to its admission as evidence against the defendants.

The defendant Ollie Parish, as a witness in his own behalf, testified that he had known Ethel Smith since she was a child. He said: "I have never had sexual intercourse with Ethel Smith. I was in love with her. I think she was fond of me. We were not particularly engaged. I did not have a job sufficient to marry. We never discussed marriage. I saw Ethel Smith on Monday, 5 November, 1934, at about 6:30 p.m. I took her in an automobile, which I had borrowed for that purpose, from her father's home to her sister's home in the city of Greensboro. I left her at her sister's home about 7 o'clock. She had asked me on Friday night to take her to her sister's home on Monday night. I did not know that she was pregnant. I did not take her to Dr. C. C. Stewart's office that night, or at any other time. I did not advise her to see Dr. Stewart or any other doctor. I was arrested and put in jail a few days after Ethel Smith was taken to the hospital. I did not say to Mr. Brewer, the brother-in-law of Ethel Smith, that I intended to marry her. He was in the jail on Sunday morning after I was put there on Saturday night."

The defendant C. C. Stewart, as a witness in his own behalf, testified that he is a physician and surgeon, and is duly licensed to practice his

profession in North Carolina. He said: "I had an office at 803½ East Market Street in the city of Greensboro during the months of October and November, 1934. I did not, during October or November, 1934, or at any other time, insert any instrument or tube, prescribe any medicine, or give any advice to a white woman named Ethel Smith for the purpose of causing her to have an abortion. I did not attend her in any capacity, nor did I have any conversation with her about quinine. I did not know the defendant Ollie Parish prior to the preliminary trial of this action. Some time between the hours of 7 and 8 o'clock, during the evening of 15 October, 1934, while I was in my office, alone, a white woman came into the office. She seemed to be excited. I asked her what I could do for her. She said that she was pregnant and asked me if I could do something for her. I told her, no. She said somebody must do something for her. I said, I am sorry. She then left the office, and I have not seen her since. The photograph shown to me and identified as a photograph of Ethel Smith appears to be a photograph of the woman who came to my office during the evening of 15 October, 1934."

There was evidence tending to corroborate the testimony of the defendant C. C. Stewart. There was also evidence tending to show that his reputation in the city of Greensboro, both as a man and as a physician, is good.

At the conclusion of all the evidence, and after the charge of the court to the jury, the jury returned a verdict as to each defendant, that he is guilty of manslaughter.

From judgment that the defendants be confined in the State's Prison at Raleigh, the defendant C. C. Stewart for a term of not less than seven or more than twelve years, and the defendant Ollie Parish for a term of not less than twelve or more than fifteen years, the defendants appealed to the Supreme Court, assigning errors in the trial.

*Attorney-General Seawell and Assistant Attorneys-General McMullan and Bruton for the State.*

*Hines & Boren and Allen Adams for defendant C. C. Stewart.*

*Henderson & Henderson for defendant Ollie Parish.*

CONNOR, J. On their appeal to this Court, each of the defendants relies chiefly on his contention that there was error in the trial of this action, in the admission as evidence against him of the testimony of Mrs. Minnie D. Hinton, with respect to statements made to her or in her presence by Ethel Smith, and with respect to answers made by Ethel Smith to questions addressed to her by the witness. These contentions must be sustained.

STATE *v.* STEWART.

The testimony of Mrs. Minnie D. Hinton, which was admitted as evidence subject to the exceptions of the defendants, if competent for any purpose, was competent as evidence tending to show dying declarations by Ethel Smith, the deceased, with respect to the facts and circumstances which resulted in her death. If the statements made by Ethel Smith, and her answers to the questions addressed to her, were not admissible as dying declarations, the testimony should have been excluded as hearsay.

In *S. v. Shelton,* 47 N. C., 360, it was said by *Pearson, J.:* "According to the general rule, no testimony is admissible unless it is subjected to two tests of truth, an oath and a cross-examination. A sense of impending death is as strong a guaranty of truth as the solemnity of an oath; but dying declarations cannot be subjected to the other test; there is no opportunity for cross-examination, and there is nothing to meet this objection and answer as an equivalent for the want of cross-examination; hence, the exception in respect to dying declarations rests solely upon the ground of public policy and the principle of necessity."

In *S. v. Williams,* 67 N. C., 13, it was said by *Rodman, J.:* "The admission of dying declarations is an exception to the general rule of evidence, which requires that the witness shall be sworn and subject to cross-examination. The solemnity of the occasion may reasonably be held to supply the place of an oath. But nothing can fully supply the absence of a cross-examination. In consequence of this absence, such declarations are often defective and obscure. Hence, eminent judges have felt it their duty to say that they should be received with much caution, and that the rule which authorizes their admission should not be extended beyond the reasons which justify it. And this is the more important as such declarations, when received, have great and sometimes undue weight with juries."

In *S. v. Jefferson,* 125 N. C., 712, 34 S. E., 648, it was said by *Montgomery, J.:* "The general rule is that testimony before it is received as evidence shall be on the oath of the witness and subject to the right of cross-examination. The nearness and certainty of death are just as strong an incentive to the telling of the truth as the solemnity of an oath, but you cannot subject the deceased, and what he said as a dying declaration, to the test of cross-examination. The exception to the general rule of evidence, therefore, in regard to dying declarations rests upon the ground of public policy and the necessity of the thing, and as the exception can only be sustained on the grounds above mentioned, such evidence is restricted by the law to the act of killing and the facts and circumstances directly attending the act and forming a part of the *res gestæ.* All of this is clearly decided in *S. v. Shelton,* 47 N. C., 360."

In *S. v. Collins,* 189 N. C., 15, 126 S. E., 98, it was said by *Adams, J.:*
"The rule for the admission of dying declarations is thus stated: (1)
At the time they were made, the declarant should have been in actual
danger of death; (2) he should have had full apprehension of his dan-
ger; (3) death should have ensued. *S. v. Mills,* 91 N. C., 581."

In *S. v. Beal,* 199 N. C., 278, 154 S. E., 604, it was said by *Stacy,
C. J.:* "The general rule is that in prosecutions for homicide, declara-
tions of the deceased, made while sane, when *in extremis* or *in articulo
mortis,* and under the solemn conviction of approaching dissolution,
concerning the killing or facts and circumstances which go to make up
the *res gestæ* of the act, are admissible in evidence, provided the de-
ceased, if living and offered as a witness in the case, would be competent
to testify to the matters contained in the declarations. *S. v. Shelton,*
47 N. C., 360; *S. v. Williams,* 67 N. C., 12; *S. v. Mills,* 91 N. C., 594;
*S. v. Behrman,* 114 N. C., 797, 19 S. E., 220; *S. v. Jefferson,* 125 N. C.,
712, 34 S. E., 648; *S. v. Laughter,* 159 N. C., 488, 74 S. E., 913. We
have a number of decisions to the effect that dying declarations are
admissible in cases of homicide when they relate to the act of killing or
to the circumstances so immediately attendant thereon as to constitute
a part of the *res gestæ,* and appear to have been made by the victim in
the present anticipation of death, which ensues. *S. v. Laughter, supra.*
It is not always necessary that the deceased should express a belief in
his impending demise; it is sufficient if the circumstances and surround-
ings in which he is placed indicate that he is fully under the influence
of the solemnity of such a belief, and so near the point of death as to
'lose the use of all deceit'—in Shakespeare's phrase. *S. v. Bagley,* 158
N. C., 608, 73 S. E., 995. In *S. v. Tilghman,* 33 N. C., 513, the Court
said: 'It is not necessary that the person should be *in articulo mortis*
(the very act of dying); it is sufficient if he be under the apprehension
of impending dissolution, when all motive for concealment or falsehood
is presumed to be absent and the party in a position as solemn as if the
oath had been administered."

In *S. v. Wallace,* 203 N. C., 284, 165 S. E., 716, it was said by *Adams,
J.:* "Dying declarations are an exception to the rule which rejects hear-
say evidence, but the conditions under which they are admitted by the
courts have often been defined. At the time they are made, the declarant
must be in actual danger of death and must have full apprehension of
his danger; and when the proof is offered, death must have ensued.
*S. v. Mills,* 91 N. C., 581. These declarations are received on the general
principle that they are made in extremity—'When,' as was said by
*Eyre, C. B.,* 'the party is at the point of death and when every hope of
this world is gone; when every motive of falsehood is silenced and the
mind is induced by the most powerful considerations to speak the truth.

A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by an oath administered in a court of justice.' *Rex v. Woodcock,* 168 Eng. Reports, 352."

Whether or not a statement made by the deceased is admissible as a dying declaration is a question for the trial court to decide. It is a question of law, and if the decision results in the admission of the statement as evidence against the defendant, it is reviewable by this Court, on defendant's appeal from a judgment against him. If there was evidence at the trial tending to show the requisite facts to support the decision, it cannot be disturbed by this Court; but in the absence of such evidence, the decision must be reversed.

A careful examination of the record in this appeal fails to disclose any evidence at the trial which tended to show that at the time she made the statement or answered the questions, as testified by Mrs. Minnie D. Hinton, Ethel Smith, the deceased, was *in extremis,* or *in articulo mortis,* or in danger of death from her present illness; or that she was under apprehension of her approaching dissolution. All the evidence is to the contrary. The statements were made and the questions answered by Ethel Smith on 16 November, 1934. She had then been in the hospital since 7 November, 1934—a period of nine days. During this time she had been under the constant care of nurses and under the daily treatment of physicians. It does not appear that she was at any time, on or prior to 16 November, 1934, advised by a nurse or by a physician that her illness would probably be fatal. Nor does it appear that at any time on or prior to 16 November, 1934, she expressed to any nurse or to any physician or to any of her relatives or friends who visited her at the hospital, apprehension that she would die of her present illness. It is true that she said to Mrs. Hinton that she was afraid she would not get well, and that in response to Mrs. Hinton's question, "Ethel, do you think you are going to die?" she whispered, "I do."

This evidence is not sufficient to support a finding of fact that Ethel Smith was fully apprehensive on 16 November, 1934, of her approaching dissolution. She did not die until 29 November, 1934—thirteen days after she made the statement and answered the questions, which were admitted as her dying declaration.

For error in the admission of the testimony of Mrs. Minnie D. Hinton as evidence tending to show dying declarations of the deceased, the defendants are entitled to a new trial. They have been convicted upon testimony which under well settled principle of the law of evidence should not have been admitted as evidence against them. Under the judgment in this conviction they will be deprived of their liberty contrary to the law of the land. The judgment is reversed to the end that they may have a

New trial.