CLARK, C. J., dissenting.
Defendant was indicted for the murder of William Brock deceased, and on issues joined and evidence offered there was a verdict of guilty of murder in the first degree, judgment, and prisoner excepted and appealed.
There was evidence on the part of the State tending to show that on Saturday night 13 January, about 10 o'clock, the prisoner followed the deceased going to his home along Pigeon Street in Waynesville, N.C. and at a point not far beyond Shelton Branch, on said street, shot and killed the deceased and that such killing was deliberate and premeditated, and from ill-feeling long harbored by the prisoner towards the deceased. There were also facts in evidence permitting the inference that the homicide was not a premeditated murder, but that deceased, going along the street some distance ahead, turned and came on the prisoner with a threatening exclamation and attitude and the prisoner shot and killed deceased on this sudden and unexpected meeting. It was proved that the fatal shot entered the front just above the heart, ranging back through the body. One R. A. Teague, a witness for the State, testified that he owned a store on Pigeon Street not far from the Shelton Branch; that Brock, the deceased, lived further out on said street beyond a colored settlement, and that George Love lived in said settlement some distance off Pigeon Street; that the ordinary place for George to leave Pigeon Street was just beyond the Shelton Branch, and that the homicide occurred a short distance beyond this, but there were other ways for him to leave Pigeon Street further on. That on the night of the homicide witness was in his store at 10:00 *Page 34 
o'clock p. m., just about his closing time; deceased was in the store sitting by the stove when the prisoner came in, bought a few things, inquired if his wife had bought their groceries yet, and asked witness if she had not done so could he get them in the morning; that a few seconds after prisoner entered Brock left, going towards his home, and soon after the prisoner left; that witness, standing in his doorway, could see the two going along Pigeon Street, the one about twenty-five or forty feet behind the other, and he saw them until they passed out of the light from two street lamps near the branch into the shadow; that witness then turned and hearing two shots looked out again and saw one of them coming back into the light, staggering, and fell — this proved to be the deceased Brock, fatally shot as stated. With a view of showing that this was a deliberate and premeditated murder the State introduced a witness by the name of Will Gaddy, who testified that in July or August preceding the homicide, witness and deceased were sitting in front of a hardware store in Waynesville and prisoner walked by and turned, looking at the deceased. Two, three, or four minutes later Brock moved off and witness, having moved up near, and heard him say to another colored boy who was with him, "Yes, I will get the God-damned son of a bitch sooner or later." In support and corroboration of this position, the State later in the trial, proposed to prove by a witness Jim Smith that 30 months before the homicide, when deceased had made a serious assault on the old father of the prisoner, the latter was heard to use language about the deceased applying to him the same epithets and showing a deadly animosity towards him, the jury having been sent out to allow a discussion of the question, the court ruled that the proposed evidence was too remote and both the circumstance of the assault and the prisoner's language concerning it was excluded. In his charge to the jury, however, the court, in stating the claims and contentions of the State that this was a wilful and deliberate homicide, from a settled and long-cherished malice felt by prisoner towards the deceased, stated and referred to the fact that 30 months before the deceased had had trouble with the father of the prisoner in the course of which deceased had knocked down the older Love." To the statement and reference thereto prisoner duly excepted and, in our opinion, the exception must be sustained. Here was a prisoner on trial for his life and the sole question was: "Was this a deliberate murder prompted by malice long harbored towards the deceased, or was it a homicide on a sudden meeting and from an instantaneous impulse, and permitting also suggestions of a killing in self-defense? And on an issue of this supreme import, after excluding the proposed testimony of a serious assault by deceased on the witness' aged father 30 months before as being too remote, puts it to the jury *Page 35 
as a fact in evidence to show the origin of the prisoner's malice and as tending to support the State's contention that this was murder done of a deliberate and settled purpose. And when coupled, as it was in this portion of the charge, with the threat proved by the witness Gaddy that within six months before the prisoner was heard to say, supposedly of the deceased, "I will get the God-damned son of a bitch sooner or later," the fact of this fight with the father became of tremendous significance as tending to show an abiding malice towards the deceased, and its statement in the hearing of the jury after it had been excluded, should undoubtedly be held for reversible error. True, this feature of the charge was prefaced by the statement that it is the contention of the State, and we have numerous decisions to the effect, that if the court, in stating the contentions, commit an error, it is too late to except to it after verdict — but while the deduction from the facts was given as a contention of the State, the putting of the fact before the jury as sworn testimony where it had been excluded was the act of the judge and of a highly prejudicial kind and none of the decisions referred to go to the extent of disallowing an exception under such circumstances. Suppose the counsel for the prisoner had excepted and on discussion the judge had withdrawn the evidence referred to, this would only have served to emphasize the error and strengthen the lodgment it had necessarily made on the minds of the jury. Like an expression of opinion by the Court on the merits of the case, the harmful impression could not well be effaced, and in our opinion, should not be taken as waived because not presently excepted to. See S. v. Cook,162 N.C. 586, and cases cited. Again it is insisted, for the State, that the evidence referred to in this portion of the charge is competent and therefore no harm has come to the prisoner in referring to it, but if this be conceded, in that aspect of the matter, there is error for the fact objected to was put before the jury in such a way and under such circumstances that gave the prisoner no opportunity of disproving it or cross-examining the witness who testified to it, it therefore violated the constitutional right of the prisoner to be confronted with the witnesses against him. The right of a defendant charged with crime to know the nature of the charge and to confront his accusers and the witnesses against him, has prominent place in our State Constitution, Article I, section 2, and appears also as the sixth of the first ten amendments adopted to the Constitution of the United States, and is universally recognized as of vital importance to the administration of well-ordered justice. S. v.Dixon, 185 N.C. 727; S. v. Dowdy, 145 N.C. 432-436. Speaking to the question in S. v. Dowdy, the Court said: "This right, of such supreme importance to the citizens, so essential to any proper and impartial administration of justice, should appeal most impressively to *Page 36 
the courts of this State, for North Carolina declined to adopt the Federal Constitution until the amendment by which it was guaranteed had been formulated by the Federal Congress and its adoption practically assured. It has, too, prominent place in our Bill of Rights, and this Court would never uphold or countenance any legislation or procedure by which it was destroyed or substantially impaired." Again it is contended, for the State, that the error, if any, is cured by the following which appears as a part of his Honor's charge: "If the jury shall find from the evidence that the prisoner had ill-feeling and malice towards the deceased and had formerly threatened the deceased, and if the jury shall further find from the evidence that the parties met accidentally upon the occasion of the fatal encounter and that the deceased suddenly advanced upon the prisoner, cursing him and threatening to `fix him,' or words to that effect, and that the prisoner instantly thereupon shot and killed the deceased, the law would attribute the motive of the killing to the present provocation and not to the preexisting malice, `unless it so appeared from the circumstances of the affair.'" But this amounts to no more than an admonition to the jury to adopt the theory of a killing on a sudden impulse from present circumstances rather than attribute it to an antecedent malice, for the closing part of the charge "unless it so appears from the circumstances of the affair" clearly leaves to the jury whether the matter be decided one way or the other. This but adds to the significance of the error complained of in putting before the jury a fact of pregnant significance on that question, which had not been testified to by any witness.
For the error indicated the prisoner is entitled to have his cause heard before another jury, and it is so ordered.
New trial.