## STATE v. HARVEY WALLACE.

(Filed 12 October, 1932.)

1. **Homicide G c—Testimony in this case held competent as being of dying declarations.**

    Where there is evidence that three Negroes entered a small country store at an early hour in the morning, that several neighbors heard shots and immediately thereafter the Negroes were seen leaving the store and the owner of the store was found therein seriously wounded, that he said "I am going to die" and related that the three Negroes had entered the store and that the "tall yellow man" had done the shooting, that the store owner died about two days thereafter and that only one of the Negroes fitted the description thus given: *Held*, testimony of the declarations of the dying man were competent, the evidence showing that the declarations were made in expectancy of death and that they sufficiently described the assailant to distinguish him from the other two Negroes in the store at the time, the question of identity being for the jury under the evidence.

2. **Homicide H c—Instruction in this case held not to contain prejudicial error when construed as a whole.**

    An instruction in a prosecution for murder that "the use of a deadly weapon in the perpetration of a murder raises a presumption of malice" will not be held for prejudicial error for the use of the word "murder" where all the evidence tends to show that the crime was murder in the first or second degree and was committed with a pistol, and when the charge, construed as a whole, correctly states the presumptions arising from the use of a deadly weapon and instructs the jury to acquit the prisoner if they did not find from the evidence that he committed or participated in the crime, the defendant's exceptions thereto will not be sustained.

3. **Same—Instruction in this case relating to presumptions from use of deadly weapon was correct.**

    The perpetration of an unlawful killing with a deadly weapon raises a presumption of malice and that the crime was murder in the first or second degree and although the defendants may rely on the State's evidence to show matters in mitigation of the offense, where the State introduces no such evidence an instruction that the burden was on the defendant to establish such matters is not error.

**4. Same—Statement of admissions of defendant held not to contain expression of opinion by the court.**

The court's recitation of the admissions of the defendant in a prosecution for murder and that from the admissions of the defendant the question of whether he was at the scene of the crime at the time of its commission was eliminated, will not be held for an expression of opinion by the court when supported by the testimony of the defendant in the case, recorded or established on appeal.

**5. Criminal Law I g—Failure to instruct jury to scrutinize testimony of accomplice is not error in absence of requested instructions.**

The failure of the trial court to instruct the jury to scrutinize the testimony of an alleged accomplice will not be held for error in the absence of a request for instructions to this effect, the matter relating to a subordinate and not a substantial feature of the charge.

CRIMINAL ACTION tried at the July Term, 1932, of LEE, before *Grady, J.*, and a jury upon an indictment charging the prisoner with the murder of N. H. Perry. From a sentence of death by electrocution pronounced upon a verdict for murder in the first degree the prisoner appealed to the Supreme Court upon assigned error.

At the trial several witnesses were examined for the State and the prisoner then took the stand in his own behalf. No other testimony was offered.

The evidence for the State tended to show that the homicide was committed under the following circumstances. N. H. Perry, the deceased, was a storekeeper at Cumnock. He was shot at his place of business on 18 June, 1932, early in the morning. On the preceding afternoon J. W. Poe and the deceased were sitting on the store porch when the prisoner and two other colored men, one of whom was Charlie Myers, passed by, "cutting their eyes towards the store" and watching the two who were on the porch. That night the colored men slept near by; and the next morning just before seven o'clock some of the witnesses heard three or four pistol shots which sounded as if they came from the store. Miss Ruth Burns saw three colored men go into the building a few minutes before the shots were fired and come out immediately afterwards. By other witnesses one of these men was identified as Harvey Wallace, the prisoner.

Miss Burns, the first person to go to the store, testified that she found Mr. Perry lying on the floor wounded and that he told her he was going to die. He then said that a few minutes before she came three colored men entered the store, one calling for a can of peaches; that as the deceased reached up to get the peaches the light colored man said to some one, "Hold on, Big Boy, do not come up here"; that the deceased looked around and saw Mr. Beal coming up the steps into the store

and the light colored man was speaking to him; that he (the light colored man) had a pistol in his hand and shot Mr. Beal as he came up the steps and killed him instantly. The deceased then said to Miss Burns, "They have already killed Mr. Beal and they have got me; do what you can for me."

O. D. Burns testified that he heard the shots, ran to the store, and found Mr. Perry with his head in the lap of his daughter, Ruth Burns; that Mr. Perry said, "They have killed Mr. Beal and they have got me; I am going to die." The witness then said that Mr. Perry told him that three persons came into the store, colored men, one of them a tall yellow man; that one of them called for a can of peaches and Mr. Perry reached up to get the can and heard some one say, "Hold on, Big Boy, do not come any further"; that he looked back and saw the tall yellow fellow with a pistol in his hands; that he had just killed Mr. Beal who was coming up the steps; and that as he (Mr. Perry) turned the yellow man shot him and all three colored men ran out of the store.

In reference to the dying declarations J. W. Poe said: "I heard Mr. Perry say, 'I am going to die; they have already killed Mr. Beal and they have got me; help me all you can. I want you all to know just exactly how it happened. Three strangers, colored men, came into the store early this morning; one was a tall, yellow, bright colored man, a mulatto, and the other two were smaller and much darker in color. The light colored man entered first and I turned to reach up and get a can of peaches. The tall yellow man pressed an automatic pistol against me and said, "Stick up your hands," and I did so; about that time Mr. Beal entered and started up the steps to the floor where I was, and the yellow man turned and said to him, "Hold on Big Boy, don't come up here." Mr. Beal did not stop and the colored man shot him twice and he died instantly. I turned to run and he shot me twice and I fell; then all three ran out of the front door. I do not know the names of the three colored men. It was the tall, yellow, bright colored man who did the shooting.' Mr. Perry was shot in the abdomen and was bleeding a great deal. This was early Saturday morning and he died Monday night following. I went with him to the hospital and on the way there he told me the same thing."

Ernest Kennedy's testimony is to this effect: That he went to the hospital with Mr. Perry; that Mr. Perry told him on the way that he was going to die, that he could not get well, and told him that three colored men came into the store and asked for some peaches; that as he reached to get the peaches he heard one of them say to some one, "Do not come any further." At that time he saw a gun in the man's hand, and that the yellow man shot Mr. Beal and killed him instantly; that he then turned and shot him, Mr. Perry, twice.

Other evidence for the State tended to show that a few days after the homicide the prisoner had a large army pistol, that he was seen roaming about asking for food, and that he told John McDougal he had killed the deceased.

Charlie Myers said that he was with Harvey Wallace at the time of the killing; that he got up with him in Raleigh and went to Cumnock; that he slept on the ground out at an old house near Mr. Perry's store; that Harvey Wallace called for a can of peaches and while Mr. Perry was reaching up to get the peaches Harvey Wallace stuck his pistol in Mr. Perry's side and said, "Stick 'em up." That about this time a man was coming up the steps and Harvey Wallace turned and shot the man; that the witness then ran out of the store and heard two more shots. The witness admitted that he was indicted for the murder of Mr. N. H. Perry along with Harvey Wallace and a man by the name of White. He testified that he went to Cumnock looking for work and that there was nothing said about holding up any store and he knew nothing about any trouble until after he got in the store when the shooting took place.

Testifying in his own behalf the prisoner said: "I got up with White and Myers in Raleigh and we went to Cumnock Coal Mines looking for work and saw the night watchman near Cumnock and asked him about work and asked for a drink of water. All three of us slept in an old barn near Cumnock store. The next morning all three of us went to the store to get something to eat. I leaned up against the counter with White behind me and Myers near the door. I asked the man for a can of peaches and asked him if we had to.buy sugar to sweeten them, and he said, 'No, they are already sweetened.' As he reached up to get the peaches White began to curse him and said he had locked him up in that store one night when he was working at the coal mine. About that time a man came up the stairway and White shot him and then I ran and heard two more shots fired, but I do not know who was shot. I left the store and went down on the railroad and came near Sanford and stopped at a colored man's house by the name of John McDougal to get something to eat. I did not tell McDougal that I did the killing. This is the pistol that White gave me. His name is engraved on the handle. After the shooting I went under the power line and went to a camp near Pembroke where I was arrested. I had this pistol on me when I was arrested. I was taken to the State penitentiary. I went in the store to buy some peaches. I had seventy-five cents. White had the pistol in his hand when it was shot. I was next to the back of the store where Mr. Perry was getting the fruit and White was behind me and Myers behind him, between us and the door which we had entered."

The prisoner admitted that the wounds inflicted by the pistol shots caused Mr. Perry's death. He did not tender any prayers for instructions. The verdict of the jury and the judgment pronounced are given above. The prisoner appealed upon exceptions pointed out in the opinion of the Court.

*Attorney-General Brummitt and Assistant Attorney-General Seawell for the State.*

*H. M. Jackson for prisoner, appellant.*

ADAMS, J. The first four exceptions taken by the prisoner question the competency of the testimony offered by the State in proof of the dying declarations of the deceased. The ground of attack is the absence of sufficient evidence to identify the assailant and to bring the declarations within the established rules of law. These exceptions, in our opinion, must be overruled.

Dying declarations are an exception to the rule which rejects hearsay evidence, but the conditions under which they are admitted by the courts have often been defined. At the time they are made the declarant must be in actual danger of death and must have full apprehension of his danger; and when the proof is offered death must have ensued. *S. v. Mills,* 91 N. C., 581. These declarations are received on the general principle that they are made in extremity—"when," as said by Eyre, C. B., "the party is at the point of death, and when every hope of this world is gone: when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth. A situation so solemn, and so awful, is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice." *Rex v. Woodcock,* 168 Eng. Reports, 352.

The testimony excepted to indicates that the deceased was conscious of impending death. A few minutes after he had been shot twice he said in the presence of witnesses, "They have killed Mr. Beal and they have got me; I am going to die." He had been shot in the abdomen and was bleeding freely. In *S. v. Mills, supra,* the declaration was, "I am dying, I have been shot three times, I am bound to die"; and in *S. v. Shouse,* 166 N. C., 306, "I know I am going to die from the wound." In *S. v. Quick,* 150 N. C., 820, the language of the deceased is recorded to have been, "He is going to die"; in *S. v. Watkins,* 159 N. C., 480, "They had killed him"; and in *S. v. Franklin,* 192 N. C., 723, "He was killed." Proof of all these declarations was held to be competent.

In the present case the trial court made no error in admitting similar proof. The fact that the deceased did not identify the prisoner by name as the one who shot him is immaterial. He did not know the name; the three men who came into the store were strangers. But the deceased described the physical appearance of the prisoner and distinguished him from his two companions. His assailant, he said, was a "light colored man," a "tall yellow man," and the other two were smaller and of darker color. The prisoner admitted that of the three men who went into the store he was the light colored man. Upon this evidence the question of his identity was appropriately left to the jury. All the declarations of the deceased relate to the facts constituting the *res gestæ* of the homicide—that is, to the act of killing and the circumstances immediately attendant. Underhill's Cr. Evidence, 3d ed., sec. 178.

The prisoner excepted to the following instruction: "The use of a deadly weapon in the perpetration of a murder raises a presumption of malice and the law says that wherever there has been an unlawful killing of a human being with a deadly weapon, nothing else appearing, the prisoner charged with the crime would be at least guilty of murder in the second degree, and the burden shifts to him to offer evidence which satisfies the jury that the killing was justifiable, or that it was done under such circumstances as to reduce the crime to manslaughter. In this case there has been no such evidence. There has been no attempt at justification and I therefore charge you that upon the evidence offered here you can return one of three verdicts, which verdict must be based upon the evidence."

Objection was made to the use of the word "murder" in the first clause; but if its use was infelicitous, as suggested, we are unable to see that it was prejudicial. There is no evidence of manslaughter or self-defense. If a crime was committed it was murder either in the first or second degree. The sentence to the effect that wherever there has been an unlawful killing with a deadly weapon, nothing else appearing, "the prisoner charged with the crime would be at least guilty of murder in the second degree" must be construed in connection with the entire charge. Every part of the charge must be read with reference to what precedes and follows. This, it has been said, is so plainly fair and just to the judge and to the parties as to have commended itself to the courts as the only reasonable rule. *S. v. Exum,* 138 N. C., 599; *Kornegay v. R. R.,* 154 N. C., 389. His Honor gave the jury the express instruction to acquit the prisoner if they did not find from the evidence that he committed or participated in the homicide. If he killed the deceased the presumption is that he did so intentionally, since all persons are presumed to intend the consequences of their acts.

STATE *v.* WALLACE.

It is true that a person on trial for a crime of this character may rely on the State's evidence to show matters in mitigation or excuse. But as the State offered no such evidence there was no error in the instruction that it was incumbent upon the defendant to establish such matters to the satisfaction of the jury. *S. v. Gaddy,* 166 N. C., 341.

The sixth and seventh exceptions relate to the court's recital of the prisoner's admission that the deceased was killed with a deadly weapon; that he was present at the time of the homicide; that some one else in the crowd ordered the deceased to stick up his hands and then shot and killed him. They relate also to the court's remark that by these admissions the question whether the prisoner was at the store was eliminated; also to the court's stating the contention that upon the prisoner's admission and other evidence the jury should find that the prisoner and his companions entered the store for the purpose of committing robbery.

These exceptions do not disclose any substantial error. Only a part of the prisoner's testimony appears in the record; but in the case on appeal it is said that he testified to other matters which are referred to in the charge and that "all statements in the charge in reference to his testimony are correct." We must therefore treat these statements as a part of the prisoner's unrecorded testimony. Neither here nor in the outline of the State's contentions referred to in the ninth, tenth, and eleventh exceptions do we find anything indicating the court's expression of an opinion concerning the evidence. In a subsequent part of the charge the court explicitly warned the jury against the impression that he had any right to entertain or express an opinion regarding the prisoner's guilt or innocence.

The prisoner contends, finally, that there is error in the court's failure to instruct the jury carefully to scrutinize the testimony of Charlie Myers, an alleged accomplice in the crime. He tendered no prayer for an instruction to this effect. In *Rex v. Jones,* 2 Camp., 132, *Lord Ellenborough* observed: "No one can seriously doubt that a conviction is legal, though it proceeds upon the evidence of an accomplice only. Judges, in their discretion, will advise a jury not to believe an accomplice unless he is confirmed, or only so far as he is confirmed; but if he is believed, his testimony is unquestionably sufficient to establish the facts he deposes. It is allowed, that he is a competent witness; and the consequence is inevitable, that if credit be given to his testimony, it requires no confirmation from another witness." In his comment upon this case *Judge Gaston* remarked, "We are not aware of any judicial decision in our country at variance with the rule brought hither by our ancestors." *S. v. Haney,* 19 N. C., 390, 397. The principle is sustained in a number of our decisions and explicitly approved in the following

words: "Instruction to scrutinize the testimony of a witness on the ground of interest or bias is a subordinate and not a substantive feature of the trial, and the judge's failure to caution the jury with respect to the prejudice, partiality, or inclination of a witness will not generally be held for reversible error unless there be a request for such instruction." *S. v. O'Neal,* 187 N. C., 22; *S. v. Sauls,* 190 N. C., 810.

We find no error in the record. The prisoner had the assistance of diligent counsel whose service, rendered under assignment by the court, is ample assurance that the prisoner has had the benefit of every available defense.

No error.