## STATE v. WAYMAN GRAINGER.

(Filed 15 December, 1943.)

**1. Criminal Law §§ 53e, 53g: Appeal and Error §§ 6a, 6b—**

An objection to instructions in a criminal case on the ground that the manner of presenting the State's contentions, and the greater prominence given them, amounted to an expression of opinion, is an exception to the rule that an objection must be made at the time; and it is not a broadside exception, if made with such particularity as to guide the court to the objectionable features.

**2. Same—**

Where, in a criminal prosecution, there is a numerical preponderance in the statement by the court of the State's contentions, referable naturally to the difference, both in the character and volume, of evidence on the respective sides, there is no cause of legal objection.

**3. Criminal Law §§ 48d, 53g—**

In a capital case, where the court first admitted evidence that officers found, immediately after the shooting, no weapon on accused but did find a pistol in a building out of which accused came a few minutes before the homicide and into which he went before his arrest, and later the court excluded it, telling the jury not to consider this evidence, there is no error, when giving the contentions of the parties, for the court to say that the State contends that defendant went into such building to prepare himself for the execution of his determination.

**4. Homicide § 27b—**

While, to show mitigation or such facts as would excuse the homicide altogether, the defendant may avail himself of the State's evidence, and in fact any evidence adduced upon the trial, the court's instruction, that it is incumbent on the defendant to show mitigating circumstances "through his own evidence or the evidence of his witnesses," is not prejudicial error where there is nothing in the State's evidence favorable to defendant in that regard.

**5. Homicide §§ 11, 16—**

Where an intentional killing is accompanied by the use of a deadly weapon, a rebuttable presumption arises of murder in the second degree, and it is thereupon incumbent on the accused to show mitigating circumstances that will reduce the crime to manslaughter, or such facts as will exonerate him altogether; and self-defense, if established to the satisfaction of the jury, will entitle him to an acquittal.

APPEAL by defendant from *Hamilton, Special Judge,* at February Term, 1943, of COLUMBUS.

The defendant was tried on a bill of indictment charging him with the murder of Harry V. "Fipps," was convicted of murder in the first degree, and sentenced to death by asphyxiation.

The State's evidence tended to show that on the night of the homicide the deceased, with Graham Walker and Wade Clewis, was walking behind the defendant about five steps in the town of Chadbourn. They observed that Grainger was with a colored girl, and Harry Phipps remarked, "Wayman, I am going to tell your wife on you for walking the street with these girls around here."

This girl turned to the left and went down toward a cafe, 50 or 75 yards away.

Grainger said to Phipps, "Harry, if you tell that, you will never tell nothing else; it will be the last thing you ever tell." Phipps told Grainger that he was just kidding, just joking with him. Grainger then "picked up in his walk" and went ahead to Frank Wooten's office, opened the door and went in. Phipps and the other two with him continued up the street and across in the vicinity of the Wooten office, when the defendant came out and called to Phipps. He told him to wait a minute, he

wanted to settle that thing with him. "Harry told him ·he was only kidding with him, just joking with him." The defendant told him he wanted him to come back there, he wanted to settle it with him, and Phipps refused, stating that if he wanted to settle it with him, he would have to come there. Defendant then exclaimed, "Look out, I'm coming in a God damned big way!" Whereupon, he ran up within three or four steps, snatched the pistol out of his overcoat pocket, and shot Phipps one time. Phipps had nothing in his hand. Phipps whirled and ran to the drug store, and Grainger went back to the Frank Wooten office. When Phipps ran into the drug store, he fell down and shortly thereafter died.

It was developed in the evidence that the party in which Phipps was walking behind Grainger consisted of four men, one weighing over 200, one 170, one 135, and one 145 pounds. Phipps had no weapon.

Robert Boswell, Chief of Police of Chadbourn, was in the drug store when Phipps staggered in in a dying condition. Almost immediately Graham Walker, who had been one of Phipps' companions, ran in and stated that "a Negro had shot him." Thereupon, Boswell, with another policeman, came out of the drug store and arrested Grainger, who was standing in front of Wooten's office. Boswell commanded Grainger to give him the gun, and Grainger replied, "I haven't got one." The policeman said, "Don't lie to me, Negro," "You have just shot a man. through the heart." And Grainger replied, "I got nothing but some keys as janitor in Mr. Wooten's place of business." The defendant was then searched and nothing was found upon him but the keys. He was then locked up.

Policeman Wright corroborated Boswell in substantial particulars, including the fact that the defendant denied having a gun.

Lester Lowe, testifying for the State, stated that he had known Wayman Grainger for some time, and that he was employed as janitor by the Waccamaw Bank & Trust Company at Chadbourn; that the office of the bank and Mr. Wooten's insurance office were in the same building on the ground floor. There is a door between the bank and Mr. Wooten's insurance office. That the defendant while janitor of the bank and for Mr. Frank Wooten had a key that would open the door between that office and the bank.

W. H. Bullard testified that he was Deputy Sheriff of Columbus County, and went to Chadbourn on the night of the homicide, and was given some keys by the jailer, which keys were offered in evidence over defendant's objection. When he came into possession of the keys, he went to the office of Mr. Frank Wooten and unlocked the front door of that office with the keys given him, proceeding to the back door of the bank and unlocking that door with another key. From information he

received from Mr. Lowe, an official of the bank, who accompanied him, he went to Mr. Wooten's office and thoroughly searched it, finding nothing, and then went into the bank. Over defendant's exception, witness was permitted to say that he went into the bank and pulled out a drawer in there, and Mr. Lowe picked up a book, and "this gun was laying in there in the drawer." There was a motion by defendant to strike out this statement, which was denied, and defendant excepted. Witness further stated that he picked up the gun and took it out of the drawer, which was admitted over the exception of the defendant. He further stated that he had had the gun ever since, and identified bullets which were in it at that time, and stated that the bullets referred to were all of them.

Thereupon, the defendant moved to strike out all the questions and elicited answers, and thereupon the judge instructed the jury: "You will not consider the testimony of this witness with reference to finding a gun and what it contained, in the bank." The defendant offered evidence tending to contradict that of the State in substantial particulars.

Tamylee Bellamy testified for defendant that on the night of the trouble she was up in front of the post office, near Wooten's office, and heard loud talking, but did not know what was said. She turned around to see what it was all about, and heard Grainger say "there is four of you and only one of me." Then she saw four white men. Grainger said, "Don't come on me." Then they started toward each other. Mr. Phipps had his hands up. Then she heard the shooting.

David Bellamy testified that he had stopped with his wife, Tamylee, and heard them arguing. He saw Wayman standing in front of Wooten's door and heard him say, "I'm a-coming down there," and this man met with him. He had never seen Phipps before, but Wayman stopped before he did, and Mr. Phipps did not stop; and Wayman said, "Don't come on me," and he was coming on him and he backed up. "I don't know how far he backed up; he backed up and he reached his hand in his pocket and shot. When Wayman backed up, Mr. Phipps kept on coming." Further, on cross-examination, this witness said that when Wayman said, "I'm coming down there," and both of them started, he said, "I'll meet you," and that one of the four men was coming ahead meeting him, and the others were coming behind. The man coming ahead was facing Wayman, walking on the street, and they got just about to one another; Wayman stopped and told Mr. Phipps not to come on him and he backed, and Mr. Phipps was coming on him and he shot.

Certain instructions to the jury to which exceptions have been made are noted in the opinion.

At the conclusion of the evidence for the State, and also at the conclusion of all the evidence, the defendant made the following motions:

To dismiss the action in so far as it related to murder in the first degree; a similar motion with regard to the charge of murder in the second degree, and a similar motion with regard to the charge of manslaughter; all of which motions were denied. The defendant excepted.

There was a verdict of murder in the first degree. The defendant moved to set aside the verdict, and the motion was denied, and defendant excepted.

The court entered judgment of death. Whereupon, the defendant appealed to the Supreme Court, and assigned error.

*Attorney-General McMullan and Assistant Attorneys-General Patton and Rhodes for the State.*

*Varser, McIntyre & Henry for the defendant, appellant.*

SEAWELL, J. We have examined the exceptions with that care which is due from the fact that defendant's appeal is from conviction of a capital crime. However, they are too numerous for separate discussion here. We turn our attention to those which seem to involve the more serious objections.

Perhaps the most important of these is the objection that, in the instructions to the jury, the manner of presenting the State's contentions, and the greater prominence given them, constitute a "summing up" in behalf of the State, amounting to an expression of opinion. *S. v. McDowell,* 129 N. C., 523, 39 S. E., 40; *S. v. Hart,* 186 N. C., 582, 587, 120 S. E., 345; *Withers v. Lane,* 144 N. C., 184, 56 S. E., 855; *Carruthers v. R. R.,* 215 N. C., 675, 678, 2 S. E. (2d), 878.

From its nature an objection of this sort does not fall within the rule ordinarily applying—that objection must be made at the time, or the exception will not lie. Nor is it classed as a broadside exception to the charge if made with such particularity as to guide the court with some certainty to the objectionable features. We would have welcomed more definite references in the instant case, but, since the nature of the objection is fully understood, we have undertaken the necessary analysis and appraisal of the charge in the light of the exception. There is a numerical preponderance in the statement of the State's contentions, referable, naturally, to the difference both in the character and in the volume of evidence on the respective sides. This is not the cause of legal objection. *S. v. Jessup,* 219 N. C., 620, 14 S. E. (2d), 668; *S. v. Cureton,* 218 N. C., 491, 11 S. E. (2d), 469. We have been unable, however, to find in the charge such a departure from the normal and impartial manner of stating the contentions of the parties as would support the pertinent objection—that it constitutes an expression of opinion on the evidence.

There are further objections that in specific instances the expressions of the judge carried with them the force of an expression of opinion, as, for example, that the court repeatedly minimized the importance of the remark originally addressed to Grainger by deceased in reference to telling Grainger's wife he was going with other girls. This contention of the State, that the words were friendly and jocular, was properly brought to the attention of the jury, if the contentions were stated at all, and we find nothing in the manner of the statement that would suggest that the court was giving its own opinion, or any opinion.

Perhaps a more serious challenge to the trial lies in the possibility that the jury may have connected the statement of the State's contention that Grainger went into the Wooten office for the purpose of arming himself with the excluded testimony of Boswell and Wright about a pistol they found in the bank. Reference to the above statement of the case shows that these officers found Grainger unarmed immediately after the shooting; that in company with an officer of the bank and with the aid of keys found upon Grainger, who was janitor of the Wooten office and of the bank, they proceeded through Wooten's office by a connecting door into the bank, where they found a pistol under a book. They were permitted to make this statement, and the pistol was exhibited upon the trial; but subsequently this evidence was stricken out. Later, in the course of his charge, the judge said to the jury:

"And the State contends that you should be satisfied beyond a reasonable doubt that when he went into the office, the real estate office, that he went in there for the purpose of preparing himself and equipping himself, putting in execution a plan that he then had fixed and determined upon."

If this had been necessarily a reference to the evidence withdrawn from the jury, the situation would be somewhat analogous to that in *S. v. Love,* 187 N. C., 32, 121 S. E., 20, where in recapitulating the evidence the judge inadvertently referred to certain evidence which had been withdrawn from consideration of the jury, and a new trial was ordered. But there is no necessary reference here to the stricken evidence. The statement of such a contention, not unreasonable under the circumstances, would certainly have been without fault if its effect was not to bring back into the picture the excluded evidence. Upon careful consideration, we do not regard it as prejudicial.

*Inter alia* the judge instructed the jury:

"So, Gentlemen, the Court instructs you that if the State has satisfied you from the evidence and beyond a reasonable doubt that the prisoner took the life of the deceased wilfully and unlawfully and intentionally, with malice and with premeditation and deliberation, your verdict would be first degree murder, but if the State has failed to satisfy you of each

and every one of those elements, particularly has failed to satisfy you that the killing resulted from premeditation and deliberation as well as from malice, an intentional, unlawful act, but has satisfied you beyond a reasonable doubt that the killing was done intentionally with a deadly weapon or that the deceased came to his death as a result of a pistol shot fired intentionally by the prisoner, then you would return a verdict of murder in the second degree unless the prisoner, himself, through his evidence or the evidence of his witnesses, has satisfied you, not beyond a reasonable doubt, but has merely satisfied you that at the time there was no malice, as defined and explained by the Court to you; then, if the prisoner has satisfied you of that, you would return a verdict of guilty of manslaughter unless the prisoner has gone further and satisfied you that the killing was in self-defense. And he has the burden of satisfying you of that contention, not beyond a reasonable doubt nor even by the greater weight of the evidence, but merely to satisfy you that the shooting as a result of which death ensued to the deceased, was in self-defense of the prisoner himself."

It will be noticed that the above instruction would make it incumbent on the defendant to show the mitigating circumstances "through his own evidence or the evidence of his witnesses." It is well settled that to show mitigation or such facts as would excuse the homicide altogether, the defendant may avail himself of the State's evidence—in fact, any evidence adduced upon the trial. *Commonwealth v. York* (Mass.), 43 Am. Dec., 373, 384, 394; 20 Am. Jur., p. 157. This, however, is not prejudicial error here—since there is nothing in the State's evidence favorable to the defendant in that regard. *S. v. Wallace,* 203 N. C., 284, 165 S. E., 716; *S. v. Cureton,* 215 N. C., 778, 3 S. E. (2d), 343.

The defendant insists that in this instruction the court not only cast upon him the burden of reducing the crime from murder in the first degree, but limited his plea of self-defense to the crime of manslaughter. The first criticism is untenable upon inspection of the language and its syntax. The last criticism does not take into consideration the fact that the court was dealing with the presumption of second degree murder arising from the intentional use of a deadly weapon—should that be established beyond a reasonable doubt—and was not dealing with the subject of self-defense generally; he did that elsewhere. It is familiar law that where an intentional killing is accomplished by the use of a deadly weapon, a rebuttable presumption arises that the defendant is guilty of murder in the second degree. *S. v. Jones,* 145 N. C., 466, 59 S. E., 353; *S. v. Rowe,* 155 N. C., 437, 71 S. E., 332; *S. v. Debnam,* 222 N. C., 266, 22 S. E. (2d), 562; *S. v. Meares,* 222 N. C., 436, 23 S. E. (2d), 311. And it is thereupon incumbent on the accused to show mitigating circumstances that will reduce the crime to manslaughter, or

such facts as will exonerate him altogether. Self-defense, if established to the satisfaction of the jury, will entitle him to an acquittal.

The formula employed here is in substantial agreement with precedent and, we think, deals with the subject fairly. *S. v. Capps,* 134 N. C., 622, 46 S. E., 730; *S. v. Quick,* 150 N. C., 820, 64 S. E., 427; *S. v. Terrell,* 212 N. C., 145, 193 S. E., 873. In other parts of the charge, dealing with the plea of self-defense directly, the instructions made it clear that the plea of self-defense should be considered upon all charges growing out of the homicide. The court repeatedly stated that defendant had a right to take life in self-defense and fully explained the circumstances under which this might be done, and particularly in the conclusion of his charge he instructed the jury with reference to self-defense:

"If he has satisfied you that the killing was done under those circumstances (referring to self-defense as defined), where he was in danger of losing his own life or suffering great bodily harm or, not being in danger actually felt that he was in danger of receiving death or great bodily harm and that the fear and apprehension on his part was only a reasonable one under the circumstances and that he used no more force than was reasonably necessary under the circumstances as they appeared to him at the time, the burden being upon him, if he has satisfied you of those things, then of course, you would return a verdict of not guilty of anything."

Upon a careful consideration of all the exceptions, and of the whole record, we find nothing which would justify us in disturbing the result of the trial. We find

No error.