STATE OF NORTH CAROLINA v. GEORGE MITCHNER.

(Filed 11 April, 1962.)

1. **Abortion § 3—**

   In a prosecution under G.S. 14-45, an actual miscarriage of the woman is not a necessary element of the offense, and while proof of pregnancy is essential, it is not necessary that the foetus should have quickened.

2. **Homicide § 1—**

   If death results from an unlawful abortion or attempted abortion of a pregnant woman, it is a culpable homicide even though done at the woman's request.

STATE *v.* MITCHNER.

**3. Homicide § 15—**

In a prosecution under an indictment charging an unlawful homicide, resulting from an unlawful abortion upon a pregnant woman, testimony that while the woman was *in extremis* she made repeated statements that she knew she was going to die, and that death ensued, *is held* sufficient predicate for the admission of her declarations that an abortion had been performed upon her and as to the name of the person who had performed the abortion.

**4. Homicide § 20; Criminal Law §§ 65, 101— Evidence identifying defendant as perpetrator held sufficient to be submitted to jury.**

In a prosecution for unlawful homicide resulting from an illegal abortion, evidence that the woman died as a result of an abortion, with testimony of the woman's dying declarations that her friend had hired a man from a certain city to perform the abortion, and her later declarations as to the name of the man who performed the abortion, together with evidence that defendant of the same name was from the city referred to, and evidence permitting the reasonable inference that after defendant had been brought to her hospital room she identified him as the man who had performed the criminal abortion upon her, and that defendant so understood, *is held* sufficient to be submitted to the jury as to the identity of defendant as the perpetrator of the crime.

**5. Homicide § 15—**

Where deceased made the declarations while she was in the hospital, the fact that she was given drugs from time to time to relieve the pain while she was in the hospital, that at times her mind was confused, and the fact of discrepancies in her dying declarations, all relate to the weight to be given by the jury to her declarations and not to the competency of the testimony.

**6. Criminal Law § 65—**

The identity of names, in the absence of any proof to the contrary, is some evidence of the identity of the person, especially when the identity of the person by name is corroborated by other facts and circumstances in evidence.

**7. Criminal Law § 126—**

The motion to set aside the verdict for lack of evidence is properly overruled when the State's evidence is of sufficient probative force to sustain the verdict.

APPEAL by defendant from *Cowper, J.,* November 1961 Term of WAYNE.

Criminal prosecution on an indictment charging the defendant did feloniously kill and murder Mildred Hargrove.

Before the introduction of evidence the solicitor announced he would ask only for a verdict of guilty of manslaughter.

Plea: Not Guilty. Verdict: Guilty of Manslaughter.

From a judgment of imprisonment, defendant appeals.

*T. W. Bruton, Attorney General, for the State.*
*Earl Whitted, Jr., and Arthur L. Lane for defendant appellant.*

PARKER, J.  Defendant introduced no evidence in his behalf. He assigns as error the denial by the trial court of his motion for judgment of involuntary nonsuit made at the close of the State's evidence.

The State's evidence shows these facts:

Mildred Hargrove on 31 May 1960 was admitted as a patient in Wayne Memorial Hospital in the city of Goldsboro. Dr. William Trachtenberg, a licensed physician, and Dr. Winfield Thompson, a surgeon, examined her within 24 hours after her admission in the hospital, and diagnosed her condition as a pelvic and abdominal peritonitis with severe infection resulting from an abortion which had become infected. Although she was operated on in the hospital five or six days later, was given large doses of medicine and drugs to combat the infection, and received constant medical care by doctors and nurses, she died in the hospital on 5 August 1960. Dr. J. A. Maher, a pathologist at the hospital, performed an autopsy upon her dead body, and testified that, in his opinion, the cause of Mildred Hargrove's death was a septic abortion that caused infection of the lining of the uterus and of the tissues around it resulting in dissolution of adjacent tissue of the intestines causing holes therein and leakage of intestinal contents into the abdomen. Dr. Maher also testified he found no evidence of the embryo, but did find placental tissue, that is afterbirth.

She suffered severe pain in the hospital, and was given drugs to moderate or numb it. Dr. William Trachtenberg testified: "She was not always lucid and clear. There were times you would walk through the hall and a lot of times she would be yelling and shouting in pain, mentally confused at times, and many times I heard her say, 'I am dying,' or, 'I'm going to die.' At that time she had every reason to believe she was going to die. I felt the same way."

She told a number of witnesses, "I am going to die, I can't live in this condition." Dr. Winfield Thompson testified, "in my opinion she was going to die."

Mrs. Bettie Siltzer, a registered nurse in the hospital, testified Mildred Hargrove told her, "I know I am going to die." Mrs. Siltzer testified that following this statement, "she [Mildred Hargrove] said that her boy friend, Willie Simmons, had hired a man from Durham to perform an abortion on her. She said this man performed an abortion on her before entering the hospital. She said the abortion took place in her home." Mrs. Siltzer testified further that on another occasion in the hospital she heard Mildred Hargrove tell T. W. Garris, an officer of the city of Goldsboro as follows: "Willie Simmons hired a

man from Durham and paid him $150.00; that the man came from Durham one night, and Willie Simmons took her small daughter off riding, and he performed the operation. She said he had a rubber catheter. . . . She told him where the rubber tube was." Garris left the hospital room, and later that day returned there with a rubber tube. Mildred Hargrove said, "Mrs. Siltzer, that's what the man used to do the abortion."

T. W. Garris testified: "She [Mildred Hargrove] said Willie Simmons got a man from Durham to perform this abortion. I asked her what his name was and she said she didn't know, he never did call him anything but 'Dock,' never told her what his name was. She said she could identify him if she could see him. I called Durham in regard to anyone they knew up there. Later I found there was a man came down with George Mitchner when the abortion was performed." Garris found a rubber tube behind the medicine cabinet in Mildred Hargrove's house, carried it to the hospital, showed it to Mildred Hargrove, and asked her if that was all he used to perform the abortion. She replied, yes. Garris received a picture of George Mitchner from the police department, apparently of Durham. He carried it to the hospital, showed it to Mildred Hargrove, and asked her if she had ever seen anybody like that. If Mildred Hargrove gave any reply, the record does not show it.

James Sasser, a deputy sheriff of Wayne County, went to Durham, and returned with George Mitchner. Sasser testified as follows: "Captain Carter and I took the defendant [Mitchner] to the hospital to the room occupied by Mildred Hargrove and asked Mildred if she knew us. She said she did, and called us by name. We asked if she could recognize the man with us, referring to George Mitchner. That is all I know about it. After taking him to the hospital, we brought him to jail and placed him inside."

This is the entire testimony of Archie Carter, captain of the plain-clothes department of the city of Goldsboro police department for 20 or more years, on direct examination:

"The only thing I did in connection with this case after George Mitchner was brought from Durham, Mr. Sasser and I carried him to the hospital to the room occupied by Mildred Hargrove. After talking with Mildred, in his presence, after a conversation with Mildred in his presence, I asked George if he had anything he wanted to say and he got over close to Mildred and asked Mildred if she was sure."

This is Captain Carter's entire testimony on cross-examination:

"Mildred never did admit it, neither did she deny it. I explained to George on the way to the hospital why we were taking him to the

hospital. As we wanted him to be faced with his accuser. After she made the statement, George asked her if she was sure."

Robert Gilliam, accompanied by his wife a sister of Mildred Hargrove, and his sister-in-law, visited Mildred Hargrove in the hospital on Monday prior to her death on Friday. Mildred Hargrove was critically ill. She said: "I am going to die; I am going to leave you all sometime this week. . . . I can't live in this condition." She referred to her stomach and the pain she had been having. Gilliam testified: "She said, 'a man did it and you all get that man.' I asked her who was it? She said, 'it was a man with Willie Simmons, George Mitchner. George Mitchner is the man,' she said performed the abortion."

Marion Gilliam, wife of Robert Gilliam and sister of Mildred Hargrove, testified to similar statements made by Mildred Hargrove, when she was present with her husband on the Monday before her sister's death on Friday. Marion Gilliam said Mildred Hargrove, while in the hospital, continued to say she was going to die. Marion Gilliam testified: "I heard her mention the name George Mitchner several times. About the second or third week she was in the hospital she called his name. She said, 'whatever you all do, get that man, because he told me he was a doctor and knew what he was doing.'"

About two weeks after Mildred Hargrove was admitted in the hospital she told Margaret Daniels she couldn't live, and that George Mitchner performed the abortion. Margaret Daniels testified: "A short time before she died, she said, 'The last thing you all do, get that George Mitchner, because he said he was a doctor and knew what he was doing.'"

Dr. J. A. Maher testified in detail as to how a rubber tube can be used to produce an abortion.

G.S. 14-45 provides, *inter alia*, if any person shall use any instrument upon any pregnant woman, with intent thereby to procure the miscarriage of such woman, or to injure or destroy such woman, he shall be guilty of a felony. This statute is designed "primarily for the protection of the woman." *S. v. Jordon*, 227 N.C. 579, 42 S.E. 2d 674.

An actual miscarriage is not a necessary element of the offense condemned by G.S. 14-45. *S. v. Hoover*, 252 N.C. 133, 113 S.E. 2d 281; 1 Am. Jur., Abortion, sec. 12.

In a prosecution for a violation of G.S. 14-45, proof of pregnancy is essential. However, a woman may be pregnant within the meaning of this statute, though the foetus has not quickened. *S. v. Hoover, supra*, and the authorities there cited.

This Court said in *S. v. Swinney*, 231 N.C. 506, 57 S.E. 2d 647: "It is generally held that when an act is in violation of a statute intended

and designed to prevent injury to the person, and is in itself dangerous, and death ensues, the person violating the statute may be held liable for manslaughter, and under some circumstances of murder."

When death results from an abortion or attempted abortion of a pregnant woman, when not necessary to save the life of the woman or that of the unborn child or to protect the health of the woman, it is a culpable homicide, even though done at the woman's request, but to what grade of unlawful homicide to assign the crime has been the subject of considerable controversy. It is variously classified by decision or statute as murder, manslaughter, or a special statutory offense which does not have any particular name. By application of the felony-murder rule it is held in some states that the defendant is guilty of murder when death results in such cases. Wharton's Criminal Law and Procedure, by Ronald A. Anderson, 1957, Vol. I, p. 525, ibid, Vol. II, sec. 749; 26 Am. Jur., Homicide, sec. 196; 40 C.J.S., Homicide, p. 923 and p. 931; Miller, Handbook of Criminal Law, pp. 269-270, p. 286, note 43; Burdick, Law of Crime, Vol. 3, sec. 872.

In Burdick, ibid, it is said:

> "As previously stated, where the death of the mother results from an unlawful abortion the homicide is murder, at common law. In the course of time, however, due to the reluctance of juries to convict of murder in such cases, English judges permitted verdicts of manslaughter to be returned when the evidence showed that the accused did not realize that he was committing an act that was dangerous to life or likely to cause great bodily harm, and had no intention of so doing."

S. v. Layton, 204 N.C. 704, 169 S.E. 650, was a criminal prosecution for manslaughter. The reported case states the indictment was for murder of Celia Roberts. The record on file in the office of the clerk of this Court shows the indictment was for manslaughter. Celia Roberts died as a result of a criminal abortion performed upon her. Defendant was convicted as charged, and on appeal no error was found in the trial below. The degree of unlawful homicide in such cases is not mentioned.

There is a very scholarly opinion on this subject in *Worthington v. State*, 92 Md. 222, 48 A. 355, 56 L.R.A. 353, 84 Am. St. Rep. 506. In this case the defendant Worthington was indicted in the criminal court of Baltimore for manslaughter, in causing the death of Amelia A. Miller, through an abortion performed on her by him. He demurred to the indictment on the ground that the death of the woman, resulting from a criminal abortion upon her, is, at common law, murder, and the indictment, if it can at all be regarded as an indictment

for homicide, is defective, because it charges death as the result of the abortion, but charges the defendant with the crime of manslaughter instead of murder. The demurrer was overruled, and defendant was convicted and sentenced to the penitentiary for ten years. The Court of Appeals said they could discover no defect in the indictment, and they thought there was no error in overruling the demurrer. In the opinion the Court said:

> "In *Regina v. Gaylor*, 7 Cox's Criminal Cases, 253, decided in 1857, the indictment was for manslaughter by abortion, and the prisoner was convicted. The evidence showed that the prisoner was clearly guilty of being accessory before the fact to the woman taking the drug with intent to procure an abortion, and the Judge reserved the case for the opinion of the Court of Criminal Appeal. It was heard before POLLOCK, C. B., BRAMWELL and WATSON, BB., and ERLE and WILLES, JJ. ERLE, J., before whom the case was tried, said: 'This would, in my opinion, be murder if she died in consequence of taking that drug. But the *grand jury* found that it was manslaughter. If a man is indicted for manslaughter, and it turns out to be murder, he may be found guilty of manslaughter. In this case I thought he was guilty of murder by administering the drug, and might therefore be convicted of manslaughter.'
>
> "The Judges affirmed the conviction, but without giving their reasons for doing so.
>
> "If the present indictment had been for murder, as it is contended it should have been, there can be no doubt a conviction of manslaughter would have been good; *State v. Flannigan*, 6 Md. 167; *State v. Davis*, 39 Md. 355; so that the defendant is in the singular position of complaining of an indictment because it does not subject him to conviction for a graver offense than that with which he is charged."

In *Peoples v. Com.*, 87 Ky. 487, 9 S.W. 509, the law on this subject is well reviewed. In this case the appellant, Mary A. Peoples, complained of her conviction for manslaughter upon the charge of committing an abortion upon Emma Wendelkin, resulting in her death. The Court of Appeals affirmed the judgment. A petition for rehearing was overruled. 87 Ky. 497, 9 S.W. 810.

*S. v. Stephens*, 244 N.C. 380, 93 S.E. 2d 431, was a criminal prosecution upon an indictment charging the defendant with the murder of his wife. The jury returned a verdict of guilty of manslaughter. This Court found no error in the trial, and closed its opinion with these words:

"The facts and circumstances point strongly to the crime of murder.

"Evidence of manslaughter is lacking. The defendant, however, cannot complain that 'the jury, by an act of grace,' has found him guilty of a lesser offense. 'Such verdicts occur now and then, despite the efforts of the courts to discourage them. When they do, although illogical or even incongruous, since they are favorable to the accused, it is settled law that they will not be disturbed.' "

There is no exception to the admission of evidence, or to the exclusion of any evidence. The indictment here is for unlawful homicide, not an abortion, and the dying declarations of Mildred Hargrove are clearly competent, because the death of Mildred Hargrove is the subject of the indictment, and the circumstances of her death the subject of her declarations. *S. v. Layton, supra; Worthington v. State, supra,* and an elaborate note on dying declarations as evidence in the volume of L.R.A., where the *Worthington* case is reported.

The State has offered plenary evidence tending to show that Mildred Hargrove was a pregnant woman, that a criminal abortion was performed upon her, and that she died as a result of a septic, criminal abortion. The crucial question is, does the State have sufficient evidence to carry the case to the jury that the defendant performed the criminal abortion. Defendant candidly states in his brief: "It is admitted that there was evidence introduced at the trial [from] which a jury might reasonably conclude that Mildred Hargrove died as a result of some criminal abortion, but there was no evidence produced at the trial (either direct or circumstantial) from which a jury might reasonably conclude that the State had presented evidence which identified the defendant as the person that performed the abortion on Mildred Hargrove."

The pertinent facts and circumstances from the evidence pointing to the accused may be summarized as follows: One, the dying declaration of Mildred Hargrove to Mrs. Bettie Siltzer, that her boy friend, Willie Simmons, had hired a man from Durham to perform an abortion on her, and that this man performed an abortion on her in her home before she entered the hospital. Two, the dying declaration of Mildred Hargrove on another occasion to T. W. Garris, an officer of the city of Goldsboro, in the presence of Mrs. Siltzer, that Willie Simmons hired a man from Durham and paid him $150.00, that this man came from Durham one night and performed the operation with a rubber catheter. Three, the repeated dying declarations of Mildred Hargrove that defendant George Mitchner was the man who per-

formed the criminal abortion on her. Four, James Sasser, a deputy sheriff of Wayne County, went to Durham and returned with defendant. Five, Sasser and Archie Carter, a police officer of Goldsboro, carried defendant to the room in the hospital where Mildred Hargrove was. After a conversation with Mildred Hargrove in defendant's presence—the record does not disclose what was said during this conversation—Carter asked the defendant if he had anything he wanted to say, and he got over close to her, and asked her if she was sure, and then Carter testified on cross-examination, "after she made the statement, George asked her if she was sure." Six, a legitimate inference may be deduced from the evidence, that the defendant's name is George Mitchner, and he is from Durham.

These facts not favorable to the State appear in the evidence: One, Mildred Hargrove told T. W. Garris, an officer of the city of Goldsboro, she didn't know the name of the man who performed the criminal abortion on her, Willie Simmons never told her what his name was, he never called him anything but Dock. Two, she told Garris she could identify him if she could see him. Garris received a picture of George Mitchner from the police department, apparently from Durham, though on this point the record is not definite, and showed it to Mildred Hargrove, and asked her if she had ever seen anybody like that. If she gave any reply, the record does not show it. Three, when Mildred Hargrove was confronted with defendant in the presence of Sasser and Carter, there is nothing in the record to show what Mildred Hargrove said, though the record shows defendant asked her if she was sure, and it further shows she "never did admit it, neither did she deny it." Four, in the hospital Mildred Hargrove was not always lucid and clear, she was mentally confused at times.

The discrepancy and contradiction in Mildred Hargrove's dying declarations, to-wit, that the person who performed the criminal abortion on her was George Mitchner, and that she didn't know his name, go to the weight of her testimony and are for the jury, and do not justify a nonsuit. *Brafford v. Cook,* 232 N.C. 699, 62 S.E. 2d 327; *Keaton v. Taxi Co.,* 241 N.C. 589, 86 S.E. 2d 93; *Com. v. Turner,* 224 Mass. 229, 112 N.E. 864, an abortion case. In the *Turner* case, the Court said: "It is true that she made contradictory statements as to the person responsible for her pregnancy but the change of names in the accusation went to the weight and not to the competency of the evidence when submitted to the jury."

This Court said in *S. v. Herren,* 173 N.C. 801, 92 S.E. 596: "This identity of names, nothing else appearing, furnishes evidence of the identity of person. 'Identity of name is prima facie evidence of iden-

tity of person, and is sufficient proof of the fact, in the absence of all evidence to the contrary.' Citing authority."

This is said in 65 C.J.S., Names, sec. 15, b., (2):

> "In general, identity of names raises a presumption, or an inference of fact, of identity of person, or it is prima facie evidence or it is, according to the decisions, presumptive evidence, or some proof or evidence, of identity of person. . . . The presumption or inference of identity of person from identity of names is not conclusive; it is prima facie only and may be disputed or rebutted. . . . Also, it has been held that at best the presumption is a weak one, and that it is liable to be shaken by the slightest proof of facts or showing of circumstances which produce a doubt of identity. . . . The presumption or inference is strengthened or augmented where the name is unusual or uncommon, where both the surnames and the given names are identical, where there is similarity of residence. . . ."

To the same effect see 20 Am. Jur., Evidence, p. 203, *et seq.*, G. IDENTITY OF PERSON FROM IDENTITY OF NAME, sections 204, 206.

When the officers carried defendant to the hospital room where Mildred Hargrove was, they asked her "if she knew us" and "she said she did, and called us by name." The officers then had a conversation with her in defendant's presence. After that Carter asked defendant "if he had anything he wanted to say and he got over close to Mildred and asked Mildred if she was sure," and the evidence further shows, "after she made the statement, George asked her if she was sure." It would seem that defendant's question "if she was sure," following immediately after the conversation of the officers with Mildred Hargrove in his presence, permits the reasonable inference that she identified him as the man who performed the criminal abortion upon her, and that he so understood it. According to the record defendant made no other statement.

The evidence is sufficient in probative value to warrant, but not compel, the jury to find that defendant George Mitchner was the person who performed the criminal abortion on Mildred Hargrove, which resulted in her death from a septic abortion, and to warrant the submission of the case to the jury.

Defendant in his brief has expressly abandoned his assignment of error to the denial of the trial court to quash the indictment.

All other assignments of error, except formal ones, are to the court's charge to the jury. They have been carefully examined, and are overruled. They present no new question, and merit no discussion.

The charge contains no expression of opinion on the facts by the trial judge.

Whether the death of a woman resulting from a criminal abortion performed upon her in violation of G.S. 14-45 is murder and not manslaughter is not presented on this appeal, for the simple reason that defendant was convicted of manslaughter.

The assignment of error to the court's refusal to set the verdict aside for lack of evidence is overruled. The evidence for the State is not strong, but it is of sufficient probative force to sustain the verdict. Mildred Hargrove's repeated declarations in the hospital that George Mitchner performed the abortion on her are impressive. The sublimest poet and dramatist of the English tongue has expressed, in King John, Act V, scene 4, the common feeling that the utterances of a dying person are free from all ordinary motives to mis-state:

> Melun. "Have I not hideous death within my view,
> Retaining but a quantity of life,
> Which bleeds away, even as a form of wax
> Resolveth from his figure 'gainst the fire?
> What in the world should make me now deceive,
> Since I must lose the use of all deceit?
> Why should I then be false, since it is true
> That I must die here and live hence by truth?"

In the trial below we find
No error.