An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-940

NORTH CAROLINA COURT OF APPEALS

Filed: 18 March 2014

STATE OF NORTH CAROLINA

   v.

KELVIN MELTON

Wake County
No. 12 CRS 4725, 4726


Appeal by defendant from judgment entered 17 October 2012 by Judge G. Wayne Abernathy in Wake County Superior Court. Heard in the Court of Appeals 21 January 2014.

> *Attorney General Roy Cooper, by Special Deputy Attorney General David P. Brenskelle, for the State.*

> *Paul F. Herzog for defendant.*


HUNTER, Robert C., Judge.


Defendant appeals the judgment entered after a jury found him guilty of assault with a deadly weapon with intent to kill inflicting serious injury ("AWDWIKISI") and attaining the status of being a habitual felon. On appeal, defendant argues: (1) the trial court committed prejudicial error in admitting a

handwritten letter into evidence and allowing it to be published to the jury in violation of Rule 901; (2) the trial court erred in admitting the testimony of Jamil Gressett with regard to a conversation he had with an acquaintance of defendant's; (3) the trial court erred in denying defendant's motion to dismiss the charge of being a violent habitual felon; and (4) the trial court violated N.C. Gen. Stat. § 15A-1442(5a) by finding that defendant's New York conviction for first degree manslaughter was substantially similar to a violent felony in North Carolina.

After careful review, we find no prejudicial error.

**Background**

The evidence presented at trial tended to establish the following: In 2002, Lechon Simpson ("Lechon") met Crystal Evans ("Crystal") in New York City. In 2006, they moved to Raleigh together and took up residence in an apartment at the back of a house occupied by Crystal's mom and her boyfriend Rayfield Harper ("Mr. Harper"). Lechon and Crystal had a son in 2009. Defendant, who is also known as "Dizzy," was Crystal's ex-boyfriend. Lechon claimed that Crystal had told him that her relationship with defendant was "not serious." Although Lechon had not met defendant, Crystal had shown Lechon pictures of him.

Crystal returned to New York for a visit in August 2011. When she returned to Raleigh, Lechon claimed that she began acting "weird." Eventually, Crystal took some clothes and their son and moved out of the residence. Lechon tried to contact Crystal many times; their phone calls became increasingly heated. After Crystal left the residence, Lechon found a handwritten letter under their mattress dated "8-7-11," but it was not signed. The letter is addressed to Crystal and is, in essence, a love letter, that includes such statements as: "Crystal I never stopped loving you" and "I Love You." Although the letter is not signed, the trial court allowed Lechon to testify at trial, over objection, that he recognized the handwriting in the letter as defendant's. Lechon based his conclusion on the fact that he had seen other letters in the past with similar handwriting signed "Dizzy."

On 13 September 2011, Lechon was at home with his nephew. He went to bed early, but awoke around 4:00 a.m. when the burglar alarm went off. Thinking it was Crystal, Lechon jumped out of bed. The kitchen light was on and Lechon saw Crystal standing in the bedroom doorway; he grabbed her by the arm. Crystal told him to "Get the F off my arm." Lechon testified that he then saw defendant standing there, rocking back and

forth. Lechon claimed at trial that although he was not entirely sure it was defendant standing there, he just "had a feeling" it was him and asked: "Dizzy?". Lechon left the bedroom by another door and ran into an eighteen- or nineteen-year-old Hispanic male pointing a gun in his face. The teenager was later identified as Jamil Gressert ("Jamil"). Defendant was standing next to Jamil. Defendant told Lechon to "shut the fuck up" and not to move. Defendant and Lechon got into a physical altercation. During the fight, Lechon realized that Jamil was shooting at him. Lechon claimed that Jamil shot at him four times. Lechon was able to escape through the back door of the apartment, and he ran to a store and called for an ambulance. Lechon was taken to Wake Med for treatment. Emergency room personnel determined that he had been shot through the hand and in the teeth. Bullet fragments were scattered through his oral cavity and in his neck near his voice box.

At trial, Jamil testified on behalf of the State. He claimed that he was a member of the "Bloods" gang in Syracuse and had been an official member since he was sixteen. In describing the structure of the gang, Jamil alleged that his immediate boss was "Jamar" who reported to "Donna G." At the

top of the hierarchy was defendant, whom Jamil knew as "Dizzy." Jamil stated that he had met defendant in 2009.

Around 13 September 2011, Jamil received a call from "Donna G." telling Jamil that "Dizzy" wanted him to come to North Carolina. Jamil took the train to Raleigh that same day. Defendant picked him up from the train station in a van with Crystal, Crystal's son, and another female. They went to Walmart to buy Jamil black clothing. Then, they went to a hotel in Raleigh. Defendant told Jamil that it was his "mission" to shoot Lechon. Crystal showed Jamil a picture of Lechon from Facebook. Defendant then told Jamil that the plan was to go to Lechon's house about four in the morning because that was the time Lechon and his nephew were planning to do some drug runs. Defendant gave Jamil a .25 semi-automatic handgun for the shooting.

That evening, Crystal called her mother several times to see if Lechon was still at home. Following these calls, Crystal called Mr. Harper to pick them up and take them to Lechon's home. Crystal told Mr. Harper that she needed to pick up a change of clothes for her son. Mr. Harper picked them up and drove them to Lechon's residence. Crystal, Jamil, and defendant went inside the house. After defendant and Lechon began

fighting, Jamil claimed that defendant told him to "Do it. Bust it." Lechon eventually knocked the gun out of Jamil's hand after Jamil fired four or five shots.

Defendant, Jamil, and Crystal all left the house to find Lechon after he ran out the back door. When they could not find him, Mr. Harper drove them back to the hotel where Jamil and defendant wiped down the room in an effort to remove any fingerprints. They called a taxi to pick them up, and they checked into another hotel in Johnston County. Defendant called a man named "Tony" to pick them up; however, after "Tony" picked them up, the police pulled them over and arrested them.

On 30 April 2012, defendant was indicted by superseding indictment for the felony offenses of attempted first degree murder and conspiracy to commit first degree murder. That same day, defendant was also indicted for AWDWIKISI and conspiracy to commit AWDWIKISI ("assault conspiracy"). Defendant was later indicted for the offense of being a violent habitual felon.

Defendant's trial began 8 October 2012. At the close of evidence, the trial court dismissed the assault conspiracy charge. On 12 October 2012, the jury found defendant guilty of AWDWIKISI and for being a violent habitual felon. The jury

found defendant not guilty of attempted first degree murder and conspiracy to commit first degree murder.

At sentencing, the trial court determined that defendant was a level V offender and sentenced him to life without parole. Defendant gave notice of appeal in open court.

**Arguments**

Defendant first argues that the trial court committed prejudicial error by admitting the handwritten letter Lechon found under his mattress into evidence. Specifically, defendant contends that the letter was not properly authenticated pursuant to Rule 901. We disagree.

"A trial court's determination as to whether a document has been sufficiently authenticated is reviewed *de novo* on appeal as a question of law." *State v. Crawley*, __ N.C. App. __, __, 719 S.E.2d 632, 637 (2011).

N.C. Gen. Stat. § 8C-1, Rule 901 (2012) provides:

> (a) General provision.--The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
>
> (b) Illustrations.--By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

> (1) Testimony of Witness with Knowledge.-- Testimony that a matter is what it is claimed to be.
>
> (2) Nonexpert Opinion on Handwriting.-- Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

"Rule 901 does not require the proponent of evidence to conclusively prove that tendered documents or electronic evidence is definitively a record, only that the evidence is relevant for the jury to conclude that it is authentic." *Crawley*, __ N.C. App. at __, 719 S.E.2d at 637. Our Supreme Court has concluded that a trial court does not err by admitting evidence pursuant to Rule 901 "if it could reasonably determine that there was sufficient evidence to support a finding that the matter in question is what its proponent claims." *State v. Wiggins*, 334 N.C. 18, 34, 431 S.E.2d 755, 764 (1993).

During *voir dire* and again before the jury, Lechon testified that he was familiar with defendant's handwriting because, between 2002 and 2006, he had seen at least ten letters handwritten by defendant addressed to Crystal. Specifically, Lechon claimed that Crystal had shown him letters from defendant in the past because defendant had made threats against him in those letters. Lechon stated that the handwriting in the letter

found under the mattress looked "exactly the same" as that of the other letters written by defendant. Over objection by defendant, the trial court admitted the letter and allowed it to be published to the jury.

Based on Lechon's testimony concerning his familiarity with defendant's handwriting, there was sufficient evidence to support a finding that the letter was written by defendant. He testified that he had not only seen at least ten letters handwritten by defendant, but he also provided an explanation as to why Crystal had shown these letters to him. Any question as to the credibility or reliability of the handwritten letter was a matter for the jury. Thus, the trial court did not err in admitting the handwritten letter pursuant to Rule 901 and publishing it to the jury.

Next, defendant argues that the trial court erred in allowing Jamil to testify about his conversation with Donna G. where she told Jamil that defendant wanted him to come to North Carolina. Specifically, defendant contends that this testimony was inadmissible hearsay and its admission violated the Confrontation Clause under *Crawford v. Washington*. We disagree.

"The trial court's determination as to whether an out-of-court statement constitutes hearsay is reviewed de novo on

appeal." *State v. Castaneda*, __ N.C. App. __, __, 715 S.E.2d 290, 293 (2011).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2013). "[O]ut-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay." *State v. Call*, 349 N.C. 382, 409, 508 S.E.2d 496, 513 (1998). This Court has noted that:

> statements of one person to another to explain subsequent actions taken by the person to whom the statements were made are admissible as non-hearsay evidence. The reason such statements are admissible is not that they fall under an exception to the hearsay rule, but that they simply are not hearsay—they do not come within the . . . legal definition of the term.

*Castaneda*, __ N.C. App. at __, 715 S.E.2d at 293 (internal citations and quotation marks omitted); *see also State v. Call*, 349 N.C. 382, 409, 508 S.E.2d 496, 513 (1998).

Here, when the State asked Jamil how and why he came to North Carolina in September 2011, he stated: "I got a call. I got a call from Donna G." and she told him that "Dizzy said to come down to North Carolina." This testimony simply explains

why Jamil came to North Carolina.  Accordingly, his testimony does not constitute hearsay because it is not being offered for the truth of the matter asserted; instead, it is being offered to explain his subsequent actions.  Therefore, the trial court did not err in admitting this evidence.

Furthermore, with regard to defendant's argument that this testimony violated the Confrontation Clause, it is without merit.  "The Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  *State v. Miller*, 197 N.C. App. 78, 87, 676 S.E.2d 546, 552 (2009) (internal quotation marks omitted).  In other words, non-hearsay statements do not come within the purview of the Confrontation Clause.  Here, as discussed, since Jamil's statements were not admitted to establish the truth of the assertions—that defendant ordered him to North Carolina—but were instead used to provide an explanation of why Jamil came to North Carolina, they were offered for a purpose other than establishing the truth of the matter asserted.  Therefore, the Confrontation Clause was not implicated.  Defendant's argument is without merit.

Next, defendant argues that the trial court erred by denying his motion to dismiss the charge of being a violent habitual felon. We disagree.

In determining whether a trial court erred in failing to grant a defendant's motion to dismiss based on the insufficiency of the evidence, this Court's review is well-established: "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000). The trial court must review the evidence in the light most favorable to the State. *State v. Barnes*, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993).

Pursuant to N.C. Gen. Stat. § 14-7.7, a violent habitual offender is defined as "[a]ny person who has been convicted of two violent felonies in any federal court, in a court of this or any other state of the United States, or in a combination of these courts." Violent felonies include any Class A through E felonies under North Carolina law and any substantially similar offenses in other jurisdictions. *Id*. N.C. Gen. Stat. § 14-7.10

explains how the State may prove that a defendant has prior convictions of violent felonies in other jurisdictions:

> A prior conviction may be proved by stipulation of the parties or by the original or a certified copy of the court record of the prior conviction. The original or certified copy of the court record, bearing the same name as that by which the defendant is charged, shall be prima facie evidence that the defendant named therein is the same as the defendant before the court, and shall be prima facie evidence of the facts set out therein.

"In creating this statutory *prima facie* case, the General Assembly has dictated what amount of evidence is sufficient for the judge to submit an habitual felon case to the jury." *State v. Hairston*, 137 N.C. App. 352, 354-55, 528 S.E.2d 29, 31 (2000).

Here, the State presented a "Certificate of Disposition" from the Supreme Court of New York stating that defendant had been convicted of manslaughter in the first degree ("first degree manslaughter") and robbery in the first degree. This evidence established a *prima facie* habitual felon case under N.C. Gen. Stat. § 14-7.7 and was sufficient to submit it to the jury. "[B]ecause the State has met the *prima facie* requirement, any discrepancies in other details contained in the judgments are for the jury to consider in weighing the evidence." *State*

*v. Wolfe*, 157 N.C. App. 22, 36, 577 S.E.2d 655, 665 (2003). Therefore, the trial court did not err in denying defendant's motion to dismiss the charge of being a violent habitual felon and submitting it to the jury.

Relatedly, defendant also contends that New York's crime of first degree manslaughter is not substantially similar to a Class A through E North Carolina felony. However, this argument is without merit. Defendant's argument is premised on the fact that, under New York law, a person may be convicted of first degree manslaughter four ways. Specifically, pursuant to NY Penal Law § 125.20, a person is guilty of manslaughter in the first degree when:

>  1. With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or

> 2. With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as defined in paragraph (a) of subdivision one of section 125.25. The fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subdivision; or

3. He commits upon a female pregnant for more than twenty-four weeks an abortional act which causes her death, unless such abortional act is justifiable pursuant to subdivision three of section 125.05; or

4. Being eighteen years old or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly engages in conduct which creates a grave risk of serious physical injury to such person and thereby causes the death of such person.

Here, it is unclear from the record under which subsection defendant was convicted of under New York law. The Certificate of Disposition indicated that defendant was convicted of statute "125.20 01"; however, the State did not present an indictment in order to clarify under which subsection of the New York law defendant was convicted. It appears from the transcript that the trial court believed that the "01" indicated that he was convicted under subsection 1 of the statute. However, according to defendant, because subsections 3 and 4 are not substantially similar to North Carolina felonies and it is unclear which subsection defendant was convicted under, defendant is entitled to a new sentencing hearing. The State disagrees, noting that because all subsections constitute violent felonies for purposes of the habitual felon charge, any error the trial court made in

assuming that defendant was convicted under subsection 1 was harmless.

"Determining whether an out-of-state conviction is substantially similar to a North Carolina offense is a question of law involving the comparison of the elements of the out-of-state offense to those of the North Carolina offense." *State v. Wright*, 210 N.C. App. 52, 71, 708 S.E.2d 112, 126 (2011); *see also State v. Hanton*, 175 N.C. App. 250, 255, 623 S.E.2d 600, 604 (2006). Questions of law are reviewed *de novo*. *Hanton*, 175 N.C. App. at 255, 623 S.E.2d at 604. Alleged errors at sentencing with regard to whether an out of state conviction is substantially similar to a North Carolina felony or misdemeanor are subject to harmless error review. *State v. Bohler*, 198 N.C. App. 631, 638, 681 S.E.2d 801, 807 (2009).

Defendant concedes that subsections 1 and 2 are substantially similar to the North Carolina crimes of second degree murder, a class B2 felony, and voluntary manslaughter, a class D felony, respectively—both of which constitute violent felonies pursuant to N.C. Gen. Stat. § 14-7.7. Furthermore, our review establishes that both subsections 3 and 4 are substantially similar to offenses in North Carolina that would constitute violent felonies. A violation of subsection 3

requires that the woman upon whom the abortional act is committed die. This offense is substantially similar to voluntary manslaughter, a Class D felony, at a minimum, or first or second degree murder, depending on the circumstances surrounding her death. Defendant contends that subsection 3 is substantially similar to N.C. Gen. Stat. § 4-45, a Class H felony. However, the North Carolina offense does not require that the female die as a result of the act; if she does, a defendant could be charged with manslaughter or murder, *see State v. Mitchner*, 256 N.C. 620, 630, 124 S.E.2d 831, 838 (1962) (noting that "[w]hether the death of a woman resulting from a criminal abortion performed upon her in violation of G.S. [§] 14-45 is murder and not manslaughter is not presented on this appeal, for the simple reason that defendant was convicted of manslaughter").

Similarly, a violation under subsection 4 requires a person who is at least 18 years old intentionally engage in conduct which creates a grave risk of physical injury to someone less than 11 years old and cause his death. Again, at a minimum, the most substantially similar North Carolina crime would be voluntary manslaughter, a Class D felony, since subsection 4 requires the element of intent. *See generally, State v. Brown*,

64 N.C. App. 578, 579-80, 307 S.E.2d 831, 832 (1983) ("The difference between voluntary and involuntary manslaughter is a question of intent. As it relates to involuntary manslaughter, intent is not an issue.").

Thus, any error the trial court may have committed in assuming that defendant was convicted under subsection 1 would be harmless since all four subsections constitute violent felonies for purposes of being a habitual felon pursuant to N.C. Gen. Stat. § 14-47.

## Conclusion

Based on the foregoing reasons, defendant's trial was free from prejudicial error.


NO PREJUDICIAL ERROR.

Judges McGEE and ELMORE concur.

Report per Rule 30(e).